Lansing, Michigan

# Opinion

Chief Justice:
Marilyn Kelly

Justices:
Michael F. Cavanagh
Elizabeth A. Weaver
Maura D. Corrigan
Robert P. Young, Jr.
Stephen J. Markman
Diane M. Hathaway

FILED JULY 27, 2010

S T A T E   O F   M I C H I G A N

SUPREME COURT

SUSAN TKACHIK, Personal Representative
of the Estate of JANET MANDEVILLE,

       Plaintiff-Appellant,

v

No. 138460

FRANK MANDEVILLE, JR.,

       Defendant-Appellee.

BEFORE THE ENTIRE BENCH

MARKMAN, J.

This case presents a relatively narrow question, one that is accessible to both the lay and legal reader: whether a husband who has abandoned his wife for the final 18 months of her life while she was battling cancer, who had no personal contact with her during this period, and who did not even attend her funeral, should have to contribute his share of the mortgage, tax, and insurance payments that the wife alone paid during her final months on real properties that they owned together. In legal terms, the question becomes whether the doctrine of contribution can be applied between co-tenants in a

tenancy by the entirety where one spouse has willfully abandoned the other before that spouse's death and, thus, is not a "surviving spouse." See MCL 700.2801(2)(e)(*i*). In either iteration of the question before this Court, the core issue is the same, and the inequities in this case are inescapable. Accordingly, the resolution of this case turns exclusively on whether the firmly established doctrine of contribution can be appropriately applied on these facts. Because there is no adequate remedy at law for the harm plaintiff alleges, because no other governing legal or equitable principle precludes this remedy, and because the relief plaintiff seeks-- when properly understood-- will not upset the common law of this state, we conclude that the equitable doctrine of contribution can be appropriately applied in this context. Therefore, we reverse the judgment of the Court of Appeals and remand to the probate court for proceedings not inconsistent with this opinion.

## I. FACTS AND HISTORY

Janet and Frank Mandeville were married in 1975 and remained so until Janet died on July 13, 2002, after a battle with breast cancer. The Mandevilles acquired two properties during their marriage. In 1984, they acquired a marital residence in Macomb County, and, in 1987, they acquired a parcel of property in Ogemaw County. They owned both properties as tenants by the entirety. Accordingly, by the right of survivorship inherent in a tenancy by the entirety, the marital real properties passed to Frank upon Janet's death. Without question, he now owns them in fee simple absolute.

In the last decade of their marriage, Frank Mandeville was often out of the country for extended periods. Specifically, he was absent for the 18 months preceding Janet's

2

death. During this period, Frank did not attempt to call Janet or otherwise communicate with her, even though, as he acknowledged, he knew that she was seriously ill. He did not attend her funeral. In Frank's absence, Janet maintained the properties and was responsible for paying the taxes, insurance, and mortgage. In Frank's absence, Janet was cared for by her sister, Susan Tkachik.

In the months before she died, Janet executed a living trust and final will that disinherited her husband and left everything to her mother, Wanda Tkachik. Janet's will stated: "It is my specific intent to give nothing to my husband under this Trust Agreement. If I am survived by my husband, for the purposes of this Trust Agreement, he will be deemed to have predeceased me." In addition, the will named Susan Tkachik (hereafter Tkachik) the personal representative of the estate. Tkachik now brings this action in that capacity. Moreover, consistent with Janet's unequivocal intent to disinherit her husband in her will, before she died, Janet also transferred her retirement benefits so that they would not pass to Frank, and she unsuccessfully attempted to defeat the right of survivorship by transferring her interest in the marital properties by quitclaim deed.

Several months after Janet's death, Frank Mandeville filed a petition for probate as well as a complaint seeking to set aside Janet's will and trust. Tkachik, acting as the personal representative of her deceased sister's estate, moved for summary disposition, arguing that Frank Mandeville should not be considered a surviving spouse because he had been willfully absent from the marriage for more than a year.[1] Applying the clear

---

[1] MCL 700.2801(2) provides, in relevant part:

language of MCL 700.2801(2), the probate court ruled that Frank Mandeville was not a "surviving spouse" and granted plaintiff's motion in October 2003.

In November 2003, Tkachik filed suit on behalf of the estate in probate court to effectuate her sister's intent to disinherit Frank Mandeville completely. Plaintiff sought a determination that, because defendant was not a "surviving spouse," the Mandevilles should be considered tenants in common with regard to their real properties and defendant should not obtain fee ownership of the properties. The probate court denied plaintiff's request, reasoning that the surviving spouse statute is limited in its application and does not destroy a tenancy by the entirety. Therefore, it properly held that upon Janet's death, fee-simple title to the properties had vested in defendant.

Plaintiff amended her complaint to seek contribution from defendant for the monetary expenses Janet incurred in maintaining the properties before her death. The probate court granted defendant's motion for summary disposition on the estate's

---

For purposes of parts 1 to 4 of this article and of section 3203, a surviving spouse does not include any of the following:

* * *

(e) An individual who did any of the following for 1 year or more before the death of the deceased person:

(*i*) Was willfully absent from the decedent spouse.

Parts 1 through 4 of Article II of the Estates and Protected Individuals Code (EPIC), MCL 700.2010 *et seq*., relate to: (1) intestate succession, (2) spousal elections, (3) spouses or children not provided for in the will, and (4) exempt property and allowances. MCL 700.3203 governs priority among persons seeking appointment as a personal representative.

contribution claim. Plaintiff filed a delayed application for leave to appeal in the Court of Appeals, which was denied for lack of merit on the grounds presented. *Tkachik v Mandeville*, unpublished order of the Court of Appeals, entered November 16, 2006 (Docket No. 270253). Initially, plaintiff's application for leave to appeal in this Court was also denied. *Tkachik v Mandeville*, 477 Mich 1057 (2007). However, this Court granted plaintiff's motion for reconsideration, and, on reconsideration and in lieu of granting leave to appeal, remanded the case to the Court of Appeals as on leave granted to consider "whether a contribution claim against the defendant, based on an unjust enrichment theory, is appropriate under the facts of the case." *Tkachik v Mandeville*, 480 Mich 898 (2007).[2]

On remand, the Court of Appeals affirmed the probate court's decision. *Tkachik v Mandeville*, 282 Mich App 364, 366; 764 NW2d 318 (2009). The panel reasoned that defendant had not been unjustly enriched because he had only received "that which was given to him by operation of law, without any obligation . . . ." *Id.* at 372. Moreover, the panel emphasized the fact that Janet was deceased, and stated that it could not enter a "posthumous divorce" based on "perceived inequities" because "Michigan law does not recognize such an action." *Id.* at 373, 378. Plaintiff again appealed in this Court. We granted plaintiff's application for leave to appeal, directing the parties to address the following issue:

---

[2] The order cited three cases that the parties were directed to consider: *Turner v Turner*, 147 Md App 350; 809 A2d 18 (2002); *Crawford v Crawford*, 293 Md 307; 443 A2d 599 (1982); and *Cagan v Cagan*, 56 Misc 2d 1045; 291 NYS2d 211 (Sup Ct, 1968).

[W]hether, when a husband has abandoned his wife for the year and a half preceding her death, and the wife alone has made mortgage, tax, and insurance payments on property held as tenants by the entirety, the wife (or her estate) may receive contribution for the husband's share of these payments.  [*Tkachik v Mandeville*, 485 Mich 853 (2009).]

## II.  STANDARD OF REVIEW

Plaintiff's claim sounds in equity, and requires this Court to consider whether the common law doctrine of contribution is appropriately applied in this context.  We hear and consider equity cases de novo on the record on appeal.  *Biske v City of Troy*, 381 Mich 611, 613; 166 NW2d 453 (1969).  The interpretation and applicability of a common-law doctrine is also a question that is reviewed de novo.  *James v Alberts*, 464 Mich 12, 14; 626 NW2d 158 (2001).  "'[T]he granting of equitable relief is ordinarily a matter of grace, and whether a court of equity will exercise its jurisdiction, and the propriety of affording equitable relief, rests in the sound discretion of the court, to be exercised according to the circumstances and exigencies of each particular case.'"  *Youngs v West*, 317 Mich 538, 545; 27 NW2d 88 (1947) (citation omitted).

## III.  ANALYSIS

Plaintiff asks this Court to exercise its equitable powers.  Therefore, this case requires an understanding of the principles that guide this Court in determining whether to provide equitable relief, a determination that, in this case, also requires consideration of the law governing tenancy by the entirety, the doctrine of contribution, and claims for unjust enrichment.

6

## A. EQUITABLE PRINCIPLES

In its sound discretion, this Court may grant equitable relief "[w]here a legal remedy is not available[.]" *Powers v Fisher*, 279 Mich 442, 448; 272 NW 737 (1937). "A remedy at law, in order to preclude a suit in equity, must be complete and ample, and not doubtful and uncertain . . . ." *Edsell v Briggs*, 20 Mich 429, 433 (1870). Furthermore, to preclude a suit in equity, a remedy at law, "both in respect to its final relief and its modes of obtaining the relief, must be as effectual as the remedy which equity would confer under the circumstances . . . ." *Powers*, 279 Mich at 447, citing 1 Pomeroy Equity Jurisprudence (3d ed), § 280. Equity jurisprudence "'mold[s] its decrees to do justice amid all the vicissitudes and intricacies of life.'" *Spoon-Shacket Co, Inc v Oakland Co*, 356 Mich 151, 163; 97 NW2d 25 (1959) (citation omitted). While legislative action that provides an adequate remedy by statute precludes equitable relief, the *absence* of such action does not. This is so because "[e]very equitable right or interest derives not from a declaration of substantive law, but from the broad and flexible jurisdiction of courts of equity to afford remedial relief, where justice and good conscience so dictate." 30A CJS, Equity, § 93, at 289 (1992). Equity allows "complete justice" to be done in a case by "adapt[ing] its judgment[s] to the special circumstances of the case." 27A Am Jur 2d, Equity, § 2, at 520-521.

## B. TENANCY BY THE ENTIRETY

A tenancy by the entirety is a type of concurrent ownership in real property that is unique to married persons. *Field v Steiner*, 250 Mich 469, 477; 231 NW 109 (1930). In *Long v Earle*, 277 Mich 505, 517; 269 NW 577 (1936), this Court explained that a

defining incident of this tenancy under Michigan law is "that one tenant by the entirety has no interest separable from that of the other" and "has nothing to convey or mortgage or to which he alone can attach a lien." Thus, when title to real estate is vested in a husband and wife by the entirety, separate alienation by one spouse only is barred. *Id*. Furthermore, MCL 557.71 states, "a husband and wife shall be equally entitled to the rents, products, income, or profits, and to the control and management of real or personal property held by them as tenants by the entirety."

In addition to these rights, both spouses have a right of survivorship, meaning that, in the event that one spouse dies, the remaining spouse automatically owns the entire property. MCL 700.2901(2)(g); *Rogers v Rogers*, 136 Mich App 125, 134; 356 NW2d 288 (1984). Thus, entireties properties are not part of a decedent spouse's estate, and the law of descent and distribution does not apply to property passing to the survivor. *Id*. at 134-135.

## C. CONTRIBUTION AND UNJUST ENRICHMENT

Contribution is an equitable remedy based on principles of natural justice. *Lorimer v Julius Knack Coal Co*, 246 Mich 214, 217; 224 NW 362 (1929). In *Caldwell v Fox*, 394 Mich 401, 417; 231 NW2d 46 (1975), this Court explained:

> The general rule of contribution is that one who is compelled to pay or satisfy the whole *or to bear more than his aliquot share of the common burden or obligation*, upon which several persons are equally liable or which they are bound to discharge, is entitled to contribution against the others to obtain from them payment of their respective shares. [Emphasis added.]

8

This Court has applied the doctrine of contribution between co-contractors. *Comstock v Potter*, 191 Mich 629, 637; 158 NW 102 (1916) ("[O]ne who has paid more than his share of the joint obligation may recover contribution from his co-contractors."). And, in *Strohm v Koepke*, 352 Mich 659, 662-663; 90 NW2d 495 (1958), this Court recognized the right of equitable contribution for tenants in common. *Strohm* grounded a co-tenant's right to contribution "upon purely equitable considerations," explaining that "[i]t is premised upon the simple proposition that equality is equity." *Id.* at 662.

Plaintiff predicates her claim for contribution on a theory of unjust enrichment. Unjust enrichment is defined as the unjust retention of "'money or benefits which in justice and equity belong to another.'" *McCreary v Shields*, 333 Mich 290, 294; 52 NW2d 853 (1952) (citation omitted). "No person is unjustly enriched unless the retention of the benefit would be unjust." *Buell v Orion State Bank*, 327 Mich 43, 56; 41 NW2d 472 (1950). *Buell* also explained: "'One is not unjustly enriched . . . by retaining benefits involuntarily acquired which law and equity give him absolutely without any obligation on his part to make restitution.'" *Id*. (citation omitted).

## D. APPLICATION

In this case, we must determine: (a) whether defendant was unjustly enriched; and, if so, (b) whether the doctrine of contribution can be appropriately applied in these circumstances to prevent his unjust enrichment. After carefully considering the governing legal and equitable principles, and after meaningfully engaging with "'the circumstances and exigencies of [this] particular case,'" as equity requires, *Youngs*, 317 Mich at 545 (citation omitted), we answer both questions in the affirmative.

## 1. UNJUST ENRICHMENT

Defendant argues, and the Court of Appeals and the dissents in this Court agree, that he has not been unjustly enriched because he "has only received that which was given to him by operation of law, without any obligation . . . ." *Tkachik*, 282 Mich App at 372. In support of this conclusion, the Court of Appeals relied on *Buell* for the proposition that there can be no unjust enrichment where a person comes into ownership of property that "'law and equity give him absolutely without any obligation on his part to make restitution.'" *Buell*, 327 Mich at 56 (citation omitted). There are significant legal and factual flaws in this argument, which we herein reject. As a threshold matter, this conclusion is based on a misreading of *Buell*, the primary authority offered in support of the conclusion that defendant has not been unjustly enriched. The Court of Appeals and the dissents fail to note what is most obvious in *Buell*, namely, that its limitation on a finding of unjust enrichment requires the consideration of both legal *and* equitable factors. Thus, even though by operation of *law* defendant received the property "absolutely," he is still unjustly enriched if he is obligated by *equity* to make restitution. *Id.* Therefore, *Buell* does not preclude a finding that defendant was unjustly enriched. Rather, its rule plainly states exactly the contrary-- that a defendant may be held to have been unjustly enriched if *equity* demands that he make restitution.

On the facts of this case, we conclude that equity, and the principles of natural justice embodied therein, call on defendant Frank Mandeville to contribute his share of the property maintenance costs incurred by his wife Janet Mandeville, who bore these obligations alone in the 18 months before her death. While defendant was willfully

10

absent from the marriage, and from the marital properties, Janet maintained the properties and incurred all the necessary expenses. In light of these facts, the Court of Appeals' and the dissents' conclusion that defendant received the properties "without any obligation" is an oversimplification that is at odds with the realities of this case. Significantly, this conclusion does not account for what *would* have happened to the properties had Janet not made the mortgage, tax, and insurance payments. Janet made those payments to preserve the undivided interest in the properties that she and her husband shared. Failure to make these mortgage and tax payments would have resulted in the loss of the properties to foreclosure. Simply put, but for Janet's payments, *there would be no property* to pass to defendant by operation of law.[3] Considering this reality, we are unable to conclude that defendant received the properties "'without any obligation on his part to make restitution.'" *Buell*, 327 Mich at 56 (citation omitted).

The Court of Appeals' and the dissents' contrary conclusion is also based on a misunderstanding concerning the relief plaintiff requests. The Court of Appeals determined that a finding of unjust enrichment "would subvert the protective purpose of the tenancy by the entirety, as it would permit the state to pierce the marital relationship and divide property contrary to how the parties chose to hold the property." *Tkachik*, 282 Mich App at 376. The flaw in this argument is that *plaintiff is not seeking to divide*

---

[3] The dissents do not account for this reality in their decisions. Rather, the fact that defendant now owns the properties only because Janet preserved the couple's undivided interest and prevented foreclosure is determinedly overlooked in the dissenting opinions.

*marital real property*, and the relief she *actually* seeks will not "subvert" or in any other way affect the law of tenancies by the entirety. Indeed, plaintiff is legally incompetent to divide or alter defendant's interest in the marital properties because, as the parties acknowledge, defendant already owns the properties in fee simple absolute, as they passed to him solely and absolutely upon Janet's death.[4] What plaintiff is seeking as the personal representative of Janet's estate is contribution for the past *monetary* expenses that Janet incurred in maintaining the marital properties while defendant was willfully absent from Janet and the properties. Thus, the fact that the properties undisputedly passed to defendant automatically by operation of law does not defeat a finding that defendant was unjustly enriched or bar a claim for contribution. As the facts here illustrate, permitting a contribution claim in these circumstances will not interfere with well-settled principles governing property held in a tenancy by the entirety and specifically will not affect the unencumbered right of survivorship.[5] Janet and Frank

---

[4] In fact, not only is plaintiff legally incompetent to divide the marital real properties, Janet herself could not have unilaterally divested defendant of his interest in the properties that they held as tenants by the entirety. Thus, although Janet attempted diligently before her death to defeat the right of survivorship by transferring her interest in the properties by quitclaim deed, this deed was ineffectual in nullifying defendant's rights in the properties. While Janet's efforts have no legal significance in regards to defendant's ownership of the properties, they *do* evidence her clear intentions regarding whether she wanted defendant to benefit from her preservation of the properties, for which she alone took responsibility in his absence.

[5] Justice YOUNG's dissent states that "[t]his is true only to a certain extent." *Post* at ___. In light of the reality that defendant owns the properties in fee simple absolute, I fail to see how this is anything but *completely* true. His dissent itself acknowledges that this decision "does not alter the actual ownership of the property," but then argues that this analysis "force[s] defendant to compensate the estate for the privilege of such

12

Mandeville held their properties as tenants by the entirety; upon Janet's death, such properties passed to Frank solely and absolutely, at which point he owned them in fee simple absolute. The law of tenancy by the entirety, and specifically the right of survivorship, has already been given full effect in this case, a result that is unaltered when Frank is required to pay contribution to plaintiff for past monetary expenses.[6]

In sum, when the applicable law is understood, and the specific circumstances of this case are evaluated in the context of a contribution claim, we conclude that defendant has been unjustly enriched by his retention of "'"money or benefits which in justice and equity belong to another.'" *McCreary*, 333 Mich at 294 (citation omitted). Defendant

---

ownership-- notwithstanding the fact that *both* the law *and* the express means by which the Mandevilles themselves titled their property provide this property to Frank Mandeville with *no conditions whatsoever*." *Post* at ___. (Emphasis in original.) No one disputes that under the law of tenancy by the entirety, and specifically by right of survivorship, defendant took the properties without any conditions or obligations at law. The open question presented in this case, however, is whether defendant in the instant circumstances is obligated now by *equity* to contribute his share of the property maintenance payments.

[6] The analysis and conclusion are the same when the question of whether defendant is unjustly enriched is viewed through a contractual lens. See *Mich Med Serv v Sharpe*, 339 Mich 574, 577; 64 NW2d 713 (1954) ("Enrichment of [a person or entity] is not unjust if pursuant to the express agreement of the parties, fairly and honestly arrived at before hand."). The fact that the properties passed to Frank in accordance with the agreement the Mandevilles made when taking title as tenants by the entirety does not preclude a finding that he was unjustly enriched because, once again, plaintiff is not seeking to affect that contract. Permitting a contribution claim to prevent unjust enrichment will not interfere with the parties' freedom to contract. Janet and Frank contracted to hold the properties by the entirety with a right of survivorship; when defendant is required to pay contribution to plaintiff, this contract will, notwithstanding, already have been given full effect: the properties passed to defendant by right of survivorship, at which point, as now, he held title in fee simple absolute.

owns the marital properties *only because of* Janet's maintenance payments. Considering his willful abandonment of Janet, by which she alone became responsible for the properties, for defendant to retain the monies that preserved these properties and made his ownership possible would be unjust.

## 2. ADEQUATE REMEDY

The next consideration is whether the doctrine of contribution can be appropriately applied in these circumstances to prevent defendant's unjust enrichment. In making this determination, the first question to be addressed is whether there is an adequate legal remedy that precludes this Court from providing equitable relief. *Powers*, 279 Mich at 447. We conclude that there is not. Although Justice YOUNG claims that "[h]ere Janet Mandeville had several available remedies that she declined to pursue," specifically arguing that Janet could have filed for divorce or separate maintenance, *post* at ___, one simply does not need to think too long or too hard about the legal remedies of divorce or separate maintenance to realize that they are entirely *in*adequate for several reasons. First, divorce, and by extension separate maintenance, is an *inappropriate* remedy for many people, especially those for whom divorce is religiously or morally objectionable.[7]

---

[7] By bringing an action for separate maintenance, a spouse is exposed to a counterclaim and judgment for divorce. See MCL 552.7(2) through (4). Notably, if a counterclaim for divorce is filed, such judgment is mandatory. MCL 552.7(4)(b) (providing that "the court *shall* enter . . . [a] judgment dissolving the bonds of matrimony if a counterclaim for divorce has been filed") (emphasis added). Thus, if divorce is an inappropriate remedy because of a person's religious or moral beliefs, separate maintenance is also. Although Justice YOUNG's dissent does not dispute our understanding of the procedural workings of an action for separate maintenance set forth in the statute, it charges that we do not adequately explain why separate maintenance

14

Second, divorce is a *disproportionate* remedy when compared to the relief actually sought-- contribution for the past monetary expenses that Janet incurred in maintaining the properties.[8]

The Court of Appeals and dissents disagree. They fault Janet for not taking legal steps to dissolve her marriage and accuse plaintiff of attempting to create a "'de facto'" divorce that would "distribute jointly held property" in the absence of such action. *Tkachik*, 282 Mich App at 373. However, this criticism is based on a persistent misunderstanding about plaintiff's claim for contribution. As stated, plaintiff's contribution claim will *not* divide the marital real properties that defendant undisputedly owns in fee simple absolute.

Thus, the remedy of divorce, which would have both dissolved the Mandevilles' bonds of marriage and necessitated a division of real property, does not constitute an adequate remedy at law for the actual, and relatively narrow, relief sought by plaintiff. As this Court has made clear,

> [t]he fact that there is a legal remedy is not the criterion. That legal remedy, both in respect to its final relief and its modes of obtaining the relief, must be as effectual as the remedy which equity would confer under the circumstances . . . . [*Powers*, 279 Mich at 447.]

---

constitutes an inadequate legal remedy. *Post* at ___. We offer exactly such an explanation in this section. It is *that dissent* that owes an explanation of its contrary position to people who have religious or moral objections to divorce.

[8] Moreover, one wonders how an action for separate maintenance at this juncture could be said to be as "effectual" in "its modes of obtaining . . . relief," *Powers*, 279 Mich at 447, where, for obvious reasons, neither Janet nor her estate can bring such an action.

15

Because the "final relief" granted in divorce-- dissolution of the marital bonds and division of marital property-- is hardly as "effectual" as contribution in recouping the limited monetary payments at issue, we do not believe that plaintiff's claim must fail because, for whatever reason, Janet did not pursue this action in life.[9]  Divorce would have been a hugely blunderbuss "remedy" in view of what plaintiff here is actually seeking, and could only be viewed as equivalently "effectual" if a surgical amputation of a toe could be viewed as equivalently "effectual" to a podiatrist appointment as a remedy for an ingrown toenail.

In addition, we do not think that plaintiff's claim is precluded by the equitable maxim that "'[e]quity will not assist a [person] whose condition is attributable only to

---

[9] The same can be said of a claim for separate maintenance.  Justice YOUNG's dissent argues at length that separate maintenance constituted Janet's sole remedy in these circumstances.  Specifically, it claims this must be true because that "the *standard* that the majority employs-- a breakdown in the marital relationship sufficient to show that the couple is no longer acting as husband and wife-- is *precisely* the standard used in an action for divorce or separate maintenance proceedings."  *Post* at ___ (emphasis in original).  His dissent misapprehends the standard we employ.  While the facts of this case certainly evidence a breakdown of the marital relationship, satisfying this standard alone is not what moves us to act in equity.  Rather, our decision is based on a fact-specific analysis that takes into account the manner in which *this* marital relationship broke down, and particularly considers the conduct of defendant as evidence of the nature and extent of the breakdown.  Simply put, marriages may break down in a variety of ways that would be sufficient to satisfy the general standard used in an action for separate maintenance or divorce.  However, it is defendant's *inequitable* conduct, evidencing the nature of the specific breakdown of *this* marriage, that satisfies the equitable standard.  Thus, contrary to Justice YOUNG's dissent, the two standards-- whether a marriage has broken down sufficiently to grant a judgment for divorce or separate maintenance and whether equity can be invoked to allow contribution between spouses-- are distinct.  Moreover, regardless of the differences between these standards, separate maintenance is an inadequate remedy in this case.

16

that want of diligence which may be fairly expected from a reasonable person.'" *Powers v Indiana & Michigan Electric Co*, 252 Mich 585, 588; 233 NW 424 (1930) (citation omitted). To find that Janet was somehow derelict in her legal responsibilities because she should have done *more* would be both inaccurate and more than a little unfair. First, Janet took significant steps in preparation for her death to make clear her intentions that her husband not receive property when she died. She unequivocally disinherited Frank in her will; she transferred her retirement benefits so that they would not pass to him; and she undertook specific efforts to divest him of his interest in the marital real properties before she died. Second, it should be remembered that she undertook these efforts as she was preparing for death, receiving treatment for breast cancer, and preserving and maintaining the two properties at issue by herself. As plaintiff's counsel explained at oral argument: "[Janet] did everything possible, including transferring her ERISA benefits, and her real property, and her estate property, all three buckets of property, to prevent them from going to her husband at the time-- and unfortunately she passed before she could take that next step whatever that next step might have been for her." In light of the hard realities in this case, we do not think that Janet was derelict in these circumstances for not doing *more* in pursuance of her legal responsibilities.[10]

_____

[10] In light of these facts, we are confident that allowing equity to come to Janet's aid, even when she did not seek a divorce or bring an action for separate maintenance while alive, will not upset any legitimate financial arrangement between the Mandevilles. This record leaves little need to speculate about how Janet felt about the "arrangement" by which she took sole responsibility for maintaining the properties at the end of her life after being abandoned by her husband. Again, she unequivocally disinherited him in her will, transferred her retirement benefits, and attempted to divest him of his interest in the

### 3. CONTRIBUTION AND TENANCY BY THE ENTIRETY

Because divorce and separate maintenance are inappropriate, disproportionate, and ineffectual remedies, an equitable remedy is necessary because there is no adequate remedy at law. *Powers*, 279 Mich at 447. Accordingly, defendant should be liable on a contribution theory for the payments Janet made in excess of her "aliquot share of the common burden or obligation . . . ." *Caldwell*, 394 Mich at 417. Although in *Strohm* this Court recognized the application of contribution between co-tenants in common, the question whether contribution can be applied between co-tenants by the entirety is one of first impression in this state. Established equitable principles guide this Court in determining whether the doctrine of contribution should be extended. We are particularly mindful that the Court's equitable powers are "'to be exercised according to the circumstances and exigencies of each particular case.'" *Youngs*, 317 Mich at 545 (citation omitted).

On these facts, we conclude that the firmly established doctrine of contribution can be appropriately applied between tenants by the entirety and, therefore, we will permit plaintiff's claim for contribution. Equity allows "complete justice" to be done by "adapt[ing] its judgment[s] to the special circumstances of the case." 27A Am Jur 2d,

---

marital real properties. Furthermore, plaintiff-- Janet's sister, the person who cared for her in her final months and who is the personal representative of her estate-- is bringing this action on Janet's behalf. These facts dispel any fear that, by permitting plaintiff's claim for contribution, we are upsetting any arrangement in contravention of Janet's intent.

18

Equity, § 2, at 520-521 (1996). Our consideration of the "special circumstances" of this case leads us to conclude that the following facts are legally sufficient to permit a claim for contribution between tenants by the entirety: (a) where the decedent spouse has taken sole responsibility for the property maintenance payments while the other spouse had absolutely no personal contact with her for at least the last 18 months of her life; (b) where the other spouse did not attempt once to communicate with the decedent spouse during this time, even though he acknowledged that he was aware that she was battling cancer; (c) where the other spouse was disinherited in the decedent spouse's will; (d) where the decedent spouse sought diligently, albeit unsuccessfully, to divest the other spouse of his interest in the real properties before she died; and (e) where the other spouse was deemed a non-surviving spouse under MCL 700.2801(2)(e)(*i*). These unusual facts cry out for equitable relief so that "complete justice" can be done and give us assurance that in granting plaintiff's remedy we are exercising our discretion carefully and responsibly.[11]

Defendant, the Court of Appeals, and Justice YOUNG's dissent raise several arguments in opposition to our determination that the doctrine of contribution can be applied appropriately in this case. Their arguments, however, do not consider equity's

---

[11] As this list of factors makes clear, contrary to Justice YOUNG's assertion, our determination that contribution is appropriately applied in this case is based on much more than an "'I know it when I see it'" intuition. *Post* at ___. Rather, it is based on a consideration of the highly unusual and inequitable circumstances of this case. Justice YOUNG's dissent itself acknowledges that the facts of this case are "rare," *post* at ___, but fails to realize that these "rare" facts are precisely what make it appropriate for this Court to do equity.

19

guiding principles, but rather are grounded on flawed legal analysis and unwarranted policy concerns. First, Justice YOUNG's dissent claims that the surviving spouse provision bars the relief plaintiff requests because, in its view, plaintiff is asking this Court to extend the provision in contradiction of its express limitations. We fail to see how granting plaintiff's equitable claim would impermissibly "extend" MCL 700.2801, when this Court is neither interpreting this provision nor acting in pursuance of its authority.[12] Rather, our power to grant equitable relief derives, not from this provision, but from this Court's inherent authority to do equity where no adequate remedy at law exists. Indeed, contribution is available to plaintiff *precisely because* neither the Estates and Protected Individuals Code nor any other statute provides, or precludes, the remedy that plaintiff seeks. Thus, the fact that MCL 700.2801 is silent with respect to contribution can hardly be said to defeat plaintiff's claim. Justice YOUNG's contrary position, under which this Court may not grant plaintiff relief because the Legislature did

---

[12] Once more, Justice YOUNG's dissent fails to recognize that we are *not* construing MCL 700.2801 or any other statutory provision in this case. The issue here only requires this Court to determine whether to exercise its equitable powers where no statute provides for or precludes such an exercise. It does not require us to give effect to any statute. For this reason, granting (or failing to grant) equitable relief cannot possibly contravene "the most basic of judicial interpretative rules." *Post* at ___ n 45. It is important to remember, however, that although *this* Court is not called upon to interpret MCL 700.2801, this provision has already been given full and proper effect by the lower court, a result that is unaltered by this decision. The probate court properly recognized the provision's limited applicability to the identified sections of EPIC, which relate to intestate succession. It thus held that defendant's status under MCL 700.2801 is immaterial to his sole ownership of the marital real properties, which passed to him by the right of survivorship, not by intestate succession. In light of this disposition, the statutory argument in Justice YOUNG's dissent is errant from the start.

20

not specify this remedy in the surviving spouse provision, ignores a basic tenet of our jurisprudence: courts possess an inherent power to afford equitable remedies. These do not derive from any "declaration of substantive law, but from the broad and flexible jurisdiction of courts of equity to afford remedial relief where justice and good conscience so dictate." 30A CJS, Equity, § 93, at 289 (1992).[13]

Second, the Court of Appeals below and Justice YOUNG's dissent distinguish and dismiss as unpersuasive decisions from other jurisdictions that permit a claim for contribution between tenants by the entirety, and, thus, lend support to plaintiff's claim in the instant case. See, e.g., *Crawford*, 293 Md 307; *Turner*, 147 Md App 350; *Cagan*, 56 Misc 2d 1045. Each of these out-of-state cases ruled that the ordinary presumption that a spouse's payments toward real property are considered a gift to the other spouse is

---

[13] For much the same reason, Justice YOUNG's observation that "the Michigan Legislature has *declined* to adopt legislation that would have accomplished statutorily exactly the changes plaintiff seeks in the common law here" has no bearing on the proper result in this case. *Post* at ___ (emphasis in original). By inserting this observation into its discussion, Justice YOUNG's dissent misses the critical difference between the respective duties of a legislative body and a court sitting in equity. While the Legislature crafts policy for the general public, a court in equity examines "the circumstances and exigencies of [the] particular case." *Youngs*, 317 Mich at 545 (citation omitted). Thus, simply because, for whatever reason, the Legislature did not adopt a broad, statewide statutory remedy-- and Justice YOUNG has no greater insight into why this transpired than anyone else-- does not mean that such a remedy is not appropriate to achieve equity in the particular circumstances of a case. Concerning Justice YOUNG's allegation that we have "fashion[ed] an unprecedented judge-created rule," *post* at ___, we can only point out, first, that the *entirety* of the common law constitutes the "fashion[ing of] a judge-created rule," the dissents' preferred rule no more and no less than the majority's; and, second, that, as a case of genuinely first impression, it is quite certain that, whatever rule prevails, it will be one without "precedent," because this is precisely how the common law has always evolved.

21

inapplicable where the spouses are not living together as husband and wife. *Crawford*, 293 Md at 311; *Turner*, 147 Md App at 407; *Cagan*, 56 Misc 2d at 1049-1050. And therefore, each of these courts recognized that the doctrine of contribution may be applicable between tenants by the entirety.

Justice YOUNG's dissent distinguishes these cases because, in its view, "[t]he common thread among these cases is that the plaintiffs were able to overcome-- *in live divorce proceedings that sought to partition marital property*-- the presumption that money expended by one party to the divorce to maintain a concurrent estate was not a gift to his or her spouse." *Post* at ___ (emphasis in original).[14] While the issues in these out-of-state cases undisputedly arise in the context of divorce and separate maintenance actions, Justice YOUNG's exclusive focus on this context in his analysis of the central teaching of these cases is questionable. From the actual language of these authorities, it seems that each of these cases stands clearly for the proposition that "a tenant by the entireties is entitled to contribution when he or she makes a payment, *after the parties*

---

[14] The Court of Appeals rejected the analysis of these cases because it determined that it was "not applicable in the context of considering whether a decedent's estate is entitled to contribution from the surviving spouse . . . ." *Tkachik*, 282 Mich App at 376. In focusing on the fact that Janet is deceased, the Court of Appeals implied that, *if* she had been living, she might have been entitled to contribution, while her estate would not be. This implication is inconsistent with MCL 600.2921, which states, "All actions and claims survive death." If, under the Court of Appeals' rationale, Janet could have sought contribution from defendant while alive, there is no reason why her estate itself should not also be able to seek contribution. See *In re Olney's Estate*, 309 Mich 65, 83; 14 NW2d 574 (1944) ("When the law declares that a cause of action shall survive, it is equivalent to saying an executor may sue upon it.") (quotation marks and citations omitted).

*discontinue living together as husband and wife*, which preserved the property and, therefore, accrued to the benefit of the co-tenant." *Crawford*, 293 Md at 313 (emphasis added); see also *Turner*, 147 Md App at 406 (explaining that *Crawford* "'permit[s] a spouse to seek contribution in those instances *when married parties were not residing together* and one of them, or the other, had paid a disproportionate amount of the carrying costs of property'") (emphasis added; citation omitted).[15]

When viewed as standing for this core proposition, the persuasive authority from sister states and the instant case have much in common. Janet and Frank Mandeville had "discontinue[d] living together as husband and wife." *Crawford*, 293 Md at 312. There was no "showing of an intention to make a gift" on Janet's part; in fact, the record is

---

[15] Justice YOUNG's dissent claims that these cases only support our position "when read out of context and after ignoring [these] decisions' own internal limitations." *Post* at 23. In response, one can merely invite the readers to peruse these cases for themselves and judge which of our readings is the more sound. In our judgment, each of these cases stand clearly for the proposition that a tenant by the entirety may be entitled to contribution when he or she makes some payment after the spouses discontinue living together as husband and wife. *Crawford*, *Turner*, and *Cagan* stand for this same proposition. Thus, Justice YOUNG's dissent does not present the whole story when it asserts that this decision renders "Michigan the one place in the common law world where a tenant by the entirety can now be liable for contribution to his deceased spouse's estate." *Post* at ___. *No state* whose courts have addressed this specific proposition has rejected it. That is, his dissent insists on focusing on the *general* rule of non-contribution between tenants by the entirety-- a rule with which we agree-- rather than the *exception* to the rule that is the subject of this case, as well as *Crawford*, *Turner*, and *Cagan*. The reader can determine what is most "disingenuous" in this case, *post* at ___ n 58-- for the dissent to include within its supposed consensus states whose judiciaries have never before addressed the *specific* issue before this Court, or for this majority to point out the artificiality of that consensus.

23

replete with evidence to the contrary. *Id.* at 313. And, Janet made payments that "preserve[d] the property, and therefore, accrue[d] to the benefit of the co-tenant [Frank]." *Id.* Under this analysis, Janet is entitled to contribution. *Id.*; see also *Turner*, 147 Md App at 407. While it is certainly possible to distinguish these cases, as the Court of Appeals and Justice YOUNG have worked hard to do, it is nonetheless difficult to dismiss them because their logic and reasoning closely resemble those of this case. These cases provide persuasive authority on which this Court may rely as it exercises its equitable jurisdiction "to afford remedial relief, where justice and good conscience so dictate." 30A CJS, Equity, § 93, at 289 (1992).

Third, the dissent warns that granting plaintiff's requested relief constitutes a "sweeping modification of the common law," *post* at ___, "represents a sea-change in our laws governing property," *post* at ___, and is the equivalent of recognizing "an action amounting to posthumous divorce." *Post* at ___. These concerns are considerably overwrought, and incorrect, largely because they are grounded in a misapprehension that the remedy plaintiff seeks will somehow result in the division of marital real property. However, as has been explained already, contrary to the Court of Appeals' and Justice YOUNG's assertions, there is nothing in the relief sought that would in any way "subvert the protective purpose of the tenancy by the entirety . . . ." *Tkachik*, 282 Mich App at 376. In this case, as in every future case, the "protective purpose of the tenancy by the

24

entirety"-- i.e. the unencumbered right of survivorship-- will be given full effect, and the surviving spouse would own entirety properties in fee simple absolute.[16]

Moreover, granting plaintiff the monetary compensation she is seeking would not require a "posthumous divorce." Indeed, this whole concept of "posthumous divorce" is inapposite, and in fact seems quite peculiar,[17] because granting plaintiff's claim for contribution would not require this Court, or any future court, to do anything even remotely akin to rendering a judgment for divorce. Plaintiff is not asking this Court to take off anyone's wedding ring, decide who gets the family heirlooms, or become involved in any of the hard issues that arise in a divorce, such as child custody, parenting time, and child and spousal support. And, as we have repeatedly made clear in this opinion, granting the relief plaintiff seeks will not divide marital real property. Instead, it will simply require a court to look to the evidence of how much Janet paid in mortgage payments, taxes, insurance, and other costs to maintain the real properties and then award an appropriate amount in the form of contribution.

---

[16] Accordingly, we are not persuaded by Justice YOUNG's overwrought accusation that this decision "upsets the reliance interests of all Michigan spouses" who have taken title to property as tenants by the entirety. *Post* at ___. Not only is this inaccurate because the right of survivorship is not affected by this decision, but it imputes ludicrous motives to Michigan spouses. We believe that there are few men and women in Michigan who get married, and who acquire property as tenants by the entirety, in *reliance* on the fact that they can later abandon their spouses and their marital property, contribute nothing to the maintenance of such property, succeed to the property upon their spouse's death, and have no further responsibilities at law or in equity. *That* is the only reliance interest that could conceivably be upset by this decision.

[17] No more peculiar, however, than Justice YOUNG's notion that we are "mentally divorcing" the Mandevilles. *Post* at ___ n 65.

Justice YOUNG's final, and most overwrought, argument is that our decision somehow "ignores the fact that marriage has always been recognized in Michigan as a *special* relationship" and "transforms this . . . into no more than a mere 'business partnership.'" *Post* at ___. Thus, our decision is "yet another (however well intentioned) assault on the institution of marriage in our country." *Post* at ___. We respectfully suggest that these arguments would be more aptly directed inwardly. It is Justice YOUNG's dissent that wishes to focus exclusively on the way that property is titled, as if the Mandevilles were mere business partners whose relationships and mutual obligations did not extend beyond their real property transactions, in other words, that a tenancy by the entirety is nothing more than a real property arrangement that is more *extra-strongly* binding upon persons who are married than upon *all* other persons. It is Justice YOUNG's dissent that ignores all evidence concerning the realities of a particular marriage, and that would-- exclusively in the case of married persons-- subordinate all such realities to the deed itself. Thus, *alone* among parties to a deed, the realities of the parties' actual conduct and relationship, and the demands of fairness and equity, would be irrelevant for married parties. Under the rule the dissents would adopt, marriage would indeed define a "special relationship," but not in a way that *honors* or *respects* marriage, but in a way that *disadvantages* marriage. Married parties *alone* would be deprived of resort to equity, no matter how compelling the circumstances, and *alone* would be bound by a legal document, no matter how unfair and inequitable its consequences in a particular circumstance. Marriage indeed entails a "special relationship," because it involves persons who have vowed to be with their spouse for better or worse, in sickness and in

health, and because it gives rise to life-long commitments of a singular nature, not because it comprises a legal arrangement in which persons are forever to be deprived of fundamental principles of equity that apply to all other persons. See *Strohm*, 352 Mich at 662. To say the least, we do not believe it is *this* opinion that degrades the *genuinely* "special relationship" of a marriage, or that treats marriage as tantamount to a mere "business partnership." The dissents accord "special" treatment to marriage only in the sense of imposing "special" disadvantages upon married persons, and by "specially" depriving such persons of a remedy in equity available to all others.

In sum, the counterarguments presented by defendant, the Court of Appeals, and the dissents are unavailing. No governing legal principle precludes the remedy plaintiff seeks, and no policy concern persuades us that granting this remedy will somehow upset the common law of this state, or produce what Justice YOUNG's dissent describes as a "tectonic shift" in our common-law jurisprudence. *Post* at ___ n 1. Rather, the decision here is altogether consonant with the "incremental process of common-law adjudication as a response to the facts presented." *In re Arbitration Between Allstate Ins Co & Stolarz*, 81 NY2d 219, 226; 597 NYS2d 904; 613 NE2d 936 (1993). Therefore, we decide this case by exercising our equitable powers "'according to the circumstances and exigencies of [this] particular case'" where no adequate remedy at law exists. *Youngs*, 317 Mich at 545 (citation omitted). Significantly, the circumstances and exigencies of this particular case contain a limiting principle that provides further assurance that we have properly exercised our discretion in granting equitable relief. Such limiting principle is inherent in MCL 700.2801, which sets forth the circumstances in which a

27

spouse is not a "surviving spouse," namely, where that spouse has been willfully absent from the decedent spouse for a year or more before the decedent's passing. As explained, this provision is not the *source* of this Court's power to grant plaintiff relief, for we possess an inherent power to afford equitable relief in our sound discretion and under carefully defined circumstances; rather, it merely provides context for when a spouse's conduct is so offensive to any "natural sense of justice" that a court may properly act.[18] With this limiting principle in place, any fear that permitting a claim for contribution in

---

[18] Justice YOUNG's dissent is highly critical of our consideration of the surviving-spouse provision, but its own analysis of the role of MCL 700.2801 is simply inaccurate. His dissent treats this provision as controlling, asserting that it precludes this Court from doing equity because "the Legislature actually *has acted* in this area through its enactment of Michigan's surviving spouse statute." *Post* at ___ (emphasis in original). In view of this assertion, we reiterate that the surviving spouse provision is *silent* as to contribution and, thus, neither permits nor precludes this Court from granting this remedy. The provision is, however, *relevant* in this case because it is descriptive of the exact behavior that moves this Court here to act in equity-- defendant willfully abandoning his wife during the last 18 months of her life. We know of no principle of statutory construction that bars a court in equity from taking into consideration conduct that is relevant to the equitable claim simply because the Legislature, in an entirely different context, has determined that such conduct is sanctionable.

Accordingly, Justice YOUNG need not wonder, "Where, other than in the guts of the majority, shall we determine how 'principles of natural justice' or 'good conscience' should direct our decisions?" *Post* at ___ n 64. If and when a court again encounters these rare facts, its determination of whether a tenant by the entirety is entitled to equitable contribution is to be informed by a time-honored and uncontroversial belief about marriage-- i.e., one spouse should not benefit from the abandonment of the other in a time of great need. This belief is reflected in community norms, the teachings of religious traditions, *and* the non-surviving spouse provision, and, thus, future courts need not concern themselves with our "guts," but can direct their decisions to these reliable guides.

28

the context of a tenancy by the entirety will result in a radical sea-change in the common law of this state rings hollow.

## IV. CONCLUSION

On the facts of this case, and particularly in considering defendant's willful absence from his decedent spouse, by which she alone took responsibility for the properties in the last year and a half of her life, it would be unjust for defendant to retain the benefit of the monies that preserved these properties and made his eventual sole ownership possible upon her death. Because divorce is an inappropriate, disproportionate, and ineffectual remedy, an equitable remedy is necessary because there is no adequate remedy at law. *Powers*, 279 Mich at 447. Accordingly, by extending the doctrine of contribution to co-tenants by the entirety, defendant is properly held liable for the payments that his spouse made in excess of her "aliquot share of the common burden or obligation . . . ." *Caldwell*, 394 Mich at 417. Thus, consistent with the longstanding and important principle of our jurisprudence concerning the availability of equitable relief, we conclude that the doctrine of contribution can be appropriately applied between tenants by the entirety and that plaintiff's claim for contribution should be granted. Accordingly, we reverse the judgment of the Court of Appeals and remand to the probate court for proceedings not inconsistent with this opinion.

KELLY, C.J., and CAVANAGH and CORRIGAN, JJ., concurred with MARKMAN, J.

29

# STATE OF MICHIGAN

## SUPREME COURT

SUSAN TKACHIK, Personal Representative
of the Estate of JANET MANDEVILLE,

      Plaintiff-Appellant,

v                                          No. 138460

FRANK MANDEVILLE, JR.,

      Defendant-Appellee.

_____

WEAVER, J. (*dissenting*).

I dissent and agree with Justice YOUNG when he states:

> With its decision today, the majority now permits posthumous collateral attacks on the validity of marriages in this state where neither spouse has taken the appropriate legal steps to challenge the marriage or the financial equities of the marriage during life. In doing so, the majority ignores the perfectly adequate legal remedies that our Legislature created in specific contemplation of marital disharmony—specifically, an action for separate maintenance—instead preferring to craft a new remedy recognized nowhere else in the country. This rule allowing contribution between tenants by the entireties *outside the context of a divorce or separate maintenance action* is not supported by a single case or authority from *any* jurisdiction, let alone authority from Michigan. As such, the new rule the majority creates today is untested and holds unforeseen consequences that reach much further than the narrow and unassuming decision the majority *believes* it has issued in this case. [Emphasis in original.]

In short, the majority's unrestrained decision today is a huge mistake.

HATHAWAY, J., concurred with WEAVER, J.

STATE OF MICHIGAN

SUPREME COURT

SUSAN TKACHIK, Personal Representative
of the Estate of JANET MANDEVILLE,

      Plaintiff-Appellant,

v                                      No. 138460

FRANK MANDEVILLE, JR.,

      Defendant-Appellee.

_____

YOUNG, J. (*dissenting*).

Because of the danger of unintended consequences and the difficulty that a court has in assessing them when amending the common law, the Hippocratic admonition to "first do no harm" is a wise prescription for restraint. It is an admonition that the majority today unfortunately ignores. Because the tenets of property law at issue here are among the most settled and uncontroversial in all of our jurisprudence, I vigorously dissent from the majority's sweeping modification of the common law in this case.[1]

---

[1] This Court has on occasion allowed for the development of the common law as the circumstances and considerations of public policy have warranted, but our common-law jurisprudence has been guided by a number of prudential principles. See Robert P. Young, Jr., *A judicial traditionalist confronts the common law*, 8 Texas Rev L & Pol 299, 305-310 (2004). Among them has been our attempt to "avoid capricious departures from bedrock legal rules as such tectonic shifts might produce unforeseen and undesirable consequences," *id.* at 307, a principle that is quite applicable to the present case.

Under the banner of equity, the majority today creates a rule that renders Michigan the one place in the common law world where a tenant by the entirety can now be liable for contribution to his deceased spouse's estate. This distinction is a dubious honor. For hundreds of years, the tenancy by the entirety with its concomitant right of survivorship has existed as a means of protecting and fostering marriage, allowing a husband and wife to manage their property and assign financial equities as they saw fit, free from interference by third parties.

With its decision today, the majority now permits posthumous collateral attacks on the validity of marriages in this state where neither spouse has taken the appropriate legal steps to challenge the marriage or the financial equities of the marriage during life. In doing so, the majority ignores the perfectly adequate legal remedies that our Legislature created in specific contemplation of marital disharmony—specifically, an action for separate maintenance—instead preferring to craft a new remedy recognized nowhere else in the country. This rule allowing contribution between tenants by the entirety *outside the context of a divorce or separate maintenance action* is not supported by a single case or authority from *any* jurisdiction, let alone authority from Michigan. As such, the new rule the majority creates today is untested and holds unforeseen consequences that reach much further than the narrow and unassuming decision the majority *believes* it has issued in this case. Moreover, although in today's decision the husband is required to make a contribution on marital property held by the entirety, given the fact that men still generally contribute more to family assets than women, I fear that the majority's new rule may have a disproportionate adverse effect on women in the future.

2

Until today, Michigan law did not recognize the right of contribution between tenants by the entirety outside the context of the divorce or separation actions, and accordingly, I believe that Janet Mandeville's estate does not have a cognizable claim for contribution to pursue against Frank Mandeville, the defendant. Simply put, under Michigan's settled law, a tenant by the entirety is not *unjustly* enriched when he takes sole ownership by operation of law over property that he previously owned with his spouse. The tenancy by the entirety is a unique incident of marriage. How married people choose to arrange their finances is varied and entirely a product of their determination. After a spouse's death, it is difficult for a court to assess any alleged inequity in the contributions of the respective spouses that they failed to address during the marriage itself. Indeed, there is a great danger in authorizing post hoc judicial inquiries concerning how a husband and wife choose to structure their marriage, as the majority authorizes in this case. Rights created by a tenancy by the entirety, being anchored in marriage, are not affected where one spouse makes greater contributions to acquiring or maintaining the property, and thus no inequities arise that would compel restitution by a surviving spouse. Where spouses do not avail themselves of the legal means of disaggregating their interests in property owned by the entirety, the courts should not be authorized to do so after one spouse dies.

## I. PRINCIPLES OF LAW AND EQUITY

Because I believe that the majority's opinion is contrary to and undermines settled principles of law and equity, I begin my analysis with an examination of the legal principles underlying this action.

3

## A. THE LAW OF TENANCY BY THE ENTIRETY

Michigan's law of estates and its rules governing concurrent estates is derived

from the English common law, although much of this law has now been codified by

statute.[2]  Generally, there are three types of concurrent estates: the tenancy in common,

the joint tenancy, and the tenancy by the entirety.[3]  The parties do not dispute that the

facts of the instant case and the issues they raise implicate only this last type of estate: the

tenancy by the entirety.

---

[2] See, generally, MCL 554.1 *et seq*.

[3] A tenancy in common, the default and most prevalent form of a concurrent estate, arises "'[w]here two or more [persons] hold possession of lands or tenements at the same time, by several and distinct titles.  The quantities of their estate may be different, their proportionate share of the premises may be unequal, the modes of acquiring these titles may be unlike, and the only unity between them be that of possession.'"  *Fenton v Miller*, 94 Mich 204, 214; 53 NW 957 (1892) (citation omitted).

A joint tenancy, by contrast, is a single estate owned by two or more parties and is characterized by four "unities": "'joint tenants have one and the same interest; accru[e] by one and the same conveyance; commenc[e] at one and the same time; and have the same possession.'"  *Kemp v Sutton*, 233 Mich 249, 258; 206 NW 366 (1925) (citation omitted).  Michigan law has subsequently abolished the requirements of unities of time and title.  See MCL 565.49.  A joint tenancy may create a special right to survivorship in a tenant following a joint tenant's death.  See *Albro v Allen*, 434 Mich 271, 274-276; 454 NW2d 85 (1990); *In re Renz' Estate*, 338 Mich 347, 356-357; 61 NW2d 148 (1953).  Our law has long recognized that while joint tenancies are not favored, their creation with the accompanying right of survivorship is nonetheless permitted when expressly created.  See *Kemp*, 233 Mich at 258; *In re Blodgett's Estate*, 197 Mich 455, 461; 163 NW 907 (1917); see also 3 Comp Laws 1915, § 11562 ("All grants and devises of lands, made to two or more persons, . . . shall be construed to create estates in common, and not in joint tenancy, unless expressly declared to be in joint tenancy."), which has endured as a legal presumption to the present day and is codified currently at MCL 554.44.

As will be discussed further in greater detail later in this opinion, a tenancy by the entirety is a unique type of joint tenancy reserved for a married couple.

---

A tenancy by the entirety is a type of concurrent ownership in real property unique to married persons.[4] A tenancy by the entirety represents a legal policy arising from the English common law whereby a husband and wife each have a sole tenancy in the real property acquired during the course of the marriage. Like many of our laws, the unique nature of this estate has a unique presumption: at common law, a husband and wife were recognized as but one legal person, and thus their ownership of real property reflected this unique status.[5] A conveyance to a husband and wife that shares the unities required for joint possession[6] presumptively creates a tenancy by the entirety unless the conveyance otherwise explicitly indicates that the parties intend to create a separate type of estate.[7] Consistent with the historical practice, under Michigan law one tenant by the

---

[4] *Field v Steiner*, 250 Mich 469, 477; 231 NW 109 (1930).

[5] Lord Blackstone has been credited with first authoritatively recording the existence of this concurrent estate. In his ubiquitous *Commentaries*, Blackstone noted:

> And therefore, if an estate in fee be given to a man and his wife, they are neither properly joint-tenants, nor tenants in common: for husband and wife being considered as one person in law, they cannot take the estate by moieties, but both are seised of the entirety, *per tout et non per my*; the consequence of which is, that neither the husband nor the wife can dispose of any part without the assent of the other, *but the whole must remain to the survivor*.

2 Blackstone, *Commentaries on the Laws of England* 182 (R Burn ed, 1783) (1978) (emphasis added).

[6] See, e.g., *Kemp*, 233 Mich at 258 (noting that the four unities required to form a joint tenancy are that of interest, title, time, and possession), although the Legislature has since abolished the necessity of unity of time and title, see MCL 565.49.

[7] *DeYoung v Mesler*, 373 Mich 499, 502-504; 130 NW2d 38 (1964). The use of the words "tenancy by the entirety" or a derivative of the phrase need not be used to

5

entirety holds no legal interest in the realty separable from that of the other tenant.[8]

Because of this legal presumption, neither spouse can act unilaterally to convey or alienate any portion of an interest in the property.[9] As this Court has stated: "When the husband and wife have thus together acquired an unencumbered title to real estate[,] they have laid up treasures, where, without their concerted action, neither moth, nor rust, nor thieves, nor creditors, nor anything else but death or the tax gatherer can divest them."[10] In sum, each spousal tenant is vested with the entire title, and thus each tenant paradoxically holds complete, *sole* ownership *jointly* with the other tenant.

The most important feature of a tenancy by the entirety is the *right of survivorship*. This right provides that in the event that one spouse dies during the course of the

create the estate; similarly, a tenancy by the entirety will *not* be created just because the words are used if not otherwise appropriate. See, e.g., *In re Kappler Estate*, 418 Mich 237; 341 NW2d 113 (1983) (holding that a conveyance to two *unmarried* persons with the words "as tenants by the entireties" was ineffective to create a tenancy by the entirety, but instead created a tenancy in common).

[8] *Long v Earle*, 277 Mich 505, 517; 269 NW 577 (1936); *Vinton v Beamer*, 55 Mich 559, 561; 22 NW 40 (1885).

[9] *Berman v State Land Office Bd*, 308 Mich 143, 144; 13 NW2d 238 (1944); *Hubert v Traeder*, 139 Mich 69, 70; 102 NW 283 (1905). The one exception to this rule is statutory: MCL 557.101 allows either spouse to convey to the other spouse his interest in the property, which thereby terminates the tenancy by the entirety. See also *Ash v Ash*, 280 Mich 198, 199; 273 NW 446 (1937) ("Defendant could terminate the tenancy by the entirety by a conveyance of his interest in the land to his wife.").

[10] *Way v Root*, 174 Mich 418, 427-428; 140 NW 577 (1913). Cf. Benjamin Franklin, Letter to Jean-Baptiste Le Roy, Nov 18, 1789, reprinted in *The Works of Benjamin Franklin* (1817) ("[B]ut in this world, nothing can be said to be certain but death and taxes.").

marriage, the surviving spouse *automatically* takes fee simple ownership in the entire property.[11] Thus, this type of property is *not* a part of the decedent's estate, and the laws of descent and distribution do not apply.[12]

A tenancy by the entirety can only be terminated in limited, specific ways. The death of one of the tenants, a joint conveyance of the property, a creditor's action against both cotenants, or a dissolution of the tenants' marriage all operate to terminate a tenancy by the entirety. As stated, the death of one of the tenants automatically passes sole title to the remaining tenant through the right of survivorship. A conveyance executed by both tenants transfers title and ownership to new grantees of the property under whatever form of estate the grantees choose. Consistent with the concept that both cotenants must act to encumber a tenancy by the entirety, a creditor's action against both a husband and wife who have together encumbered their property may terminate the tenancy.[13] Finally, in divorce proceedings after a marriage has been terminated, property held as a tenancy by the entirety becomes a tenancy in common unless the parties or the court terminating the marriage provides otherwise.[14] During this time, as is consistent with divorce

---

[11] MCL 700.2901(2)(g); see also *Speier v Opfer*, 73 Mich 35, 38-39; 40 NW 909 (1888).

[12] See, e.g., *Rogers v Rogers*, 136 Mich App 125, 134-135; 356 NW2d 288 (1984).

[13] *Sanford v Bertrau*, 204 Mich 244, 254; 169 NW 880 (1918); see also *Estes v Titus*, 481 Mich 573, 580-582; 751 NW2d 493 (2008).

[14] MCL 700.2807(1)(b).

proceedings generally, the court equitably divides all marital property, including real property that had been held as a tenancy by the entirety.

## B. THE RIGHT OF CONTRIBUTION AND CLAIMS FOR UNJUST ENRICHMENT

The doctrine of equitable contribution has evolved from the common law and is "founded on principles of equity and natural justice."[15] It provides that one who pays or satisfies "the whole or [bears] more than his aliquot share of the common burden or obligation, upon which several persons are equally liable or which they are bound to discharge, is entitled to contribution against the others to obtain from them payment of their respective shares."[16] Thus, where contribution is appropriate to reach an equitable result, the party seeking contribution may recover the proportionate share from each of the joint obligors.[17]

Regarding concurrent estates, claims for contribution are generally available to cotenants who hold real property as tenants in common or joint tenants.[18] As this Court held in *Strohm v Koepke*, which acknowledged the right of equitable contribution for tenants in common, "[t]he doctrine of contribution between cotenants is based upon

---

[15] *Lorimer v Julius Knack Coal Co*, 246 Mich 214, 217; 224 NW 362 (1929).

[16] *Caldwell v Fox*, 394 Mich 401, 417; 231 NW2d 46 (1975).

[17] *Id.*

[18] See, e.g., *Wettlaufer v Ames*, 133 Mich 201; 94 NW 950 (1903); *Reed v Reed*, 122 Mich 77, 78-79; 80 NW 996 (1899).

purely equitable considerations."[19] However, neither Michigan's statutory law nor any decision by this Court or any Michigan court has ever specifically recognized the right of contribution for a husband and wife who hold their property as a tenancy by the entirety.

Even though a tenancy by the entirety resembles a joint tenancy, a tenancy by the entirety is *not* a joint tenancy; rather, it is a type of sole tenancy.[20] Our law has recognized important distinctions among these cotenancies, providing rights and responsibilities to some but not others. For example, joint tenants and tenants in common have a statutory right of partition; tenants by the entirety do not.[21] Also, joint tenants and tenants in common may unilaterally convey their property rights for any reason; tenants by the entirety may not.[22] These distinctions and others represent a type of severability among other concurrent estates not permitted in a tenancy by the entirety.

---

[19] *Strohm v Koepke*, 352 Mich 659, 662; 90 NW2d 495 (1958). The law of other jurisdictions is generally in accord. For example, the Restatement of Restitution has long stated: "Where two persons are *tenants in common or joint tenants* and one of them has taken reasonably necessary action for the preservation of the subject matter or of their common interests, he is entitled to indemnity or contribution . . . ." Restatement Restitution, § 105(1), p 439 (1937) (emphasis added).

[20] *Budwit v Herr*, 339 Mich 265, 272; 63 NW2d 841 (1954).

[21] MCL 600.3304 ("All persons holding lands as joint tenants or as tenants in common may have those lands partitioned."); see also 1 Restatement Property, 2d), § 4.5, comment b, p 229 (1983) ("A tenancy by the entirety creates an indestructible right in the surviving spouse to own in severalty the entire interest in the property. Compulsory partition is inconsistent with this characteristic of a tenancy by the entirety and, hence, compulsory partition is not available with respect to such a tenancy.").

[22] Compare *Pellow v Arctic Iron Co*, 164 Mich 87; 128 NW 918 (1910), with *Hubert*, 139 Mich at 70.

9

This understanding is in accord with the historical tradition of the tenancy by the entirety, because it has been inextricably tied to marriage.[23] At common law, where the law viewed a married couple as a single legal person, there was no legal need to allow recovery or contribution by one tenant essentially against himself. By contrast, other types of cotenancies among nonmarried persons—whether they are two or more relatives, friends, business partners, or any other combination of individuals who may jointly buy real property—do not share the bond of marriage, and thus the law allowed mechanisms for recovery if one party was forced to assume more than his fair share of the costs or if there was a breakdown in the relationship. Moreover, a tenancy by the entirety already contained a mechanism for the contingency that a marriage relationship may break down: separation or divorce expressly allowed the courts to divide equitably property owned by the tenants.

However, the lack of a specific provision or doctrine of law providing a right of contribution in a tenancy by the entirety does not necessarily preclude a right of contribution. In the instant case, plaintiff advances the theory that Frank Mandeville is liable for contribution to the decedent's estate on the basis of a theory of unjust enrichment.

---

[23] See *In re Appeal of Lewis*, 85 Mich 340; 48 NW 580 (1891).

Unjust enrichment is defined as the unjust retention of "'money or benefits which in justice and equity *belong to another*.'"[24] The Restatement provides that "[e]ven where a person has received a benefit from another, he is liable to pay therefor only if the circumstances of its receipt or retention are such that, as between the two persons, it is unjust for him to retain it."[25] This Court adopted a similar standard in *Buell v Orion State Bank*: "One is not unjustly enriched . . . by retaining benefits involuntarily acquired which law and equity give him absolutely without any obligation on his part to make restitution."[26] Thus, there can be no unjust enrichment where a party only receives or retains that which he already owns by operation of law.

## II. APPLICATION

With these principles regarding Michigan's law of real property and equity in mind, I turn to the facts of this particular case. Plaintiff asks this Court to order contribution from Frank Mandeville to his deceased wife's estate under two alternative theories: either by a claim of unjust enrichment, or by extending Michigan property law

[24] *McCreary v Shields*, 333 Mich 290, 294; 52 NW2d 853 (1952), quoting approvingly *Hummel v Hummel*, 133 Ohio St 520, 528; 14 NE2d 923 (1938) (emphasis added).

[25] Restatement Restitution, § 1, comment c, p 13 (1937). This Court has previously quoted approvingly this standard in *Dumas v Auto Club Ins Ass'n*, 437 Mich 521, 546; 473 NW26 652 (1991) (lead opinion by RILEY, J.).

[26] *Buell v Orion State Bank*, 327 Mich 43, 56; 41 NW2d 472 (1950). This Court has similarly held that one cannot be unjustly enriched simply as a result of enforcing private agreements. See, e.g., *Mich Med Serv v Sharpe*, 339 Mich 574, 577; 64 NW2d 713 (1954) ("It is neither unjust, unfair nor inequitable to give effect to an agreement which was not induced by mistake, overreaching, fraud[,] or misrepresentation.").

11

to allow for a claim of contribution in a tenancy by the entirety. The majority has accepted this request, arguing that if there is no mechanism by which the estate can recover defendant's proportionate share for money the decedent expended to maintain the tenancy's properties, then defendant will be unjustly enriched by his wife's maintenance of the properties before her death. Contrarily, defendant argues that contribution designed to prevent unjust enrichment does not apply where a cotenant by the entirety receives property by the right of survivorship. For the reasons set forth below, I agree with defendant.

## A. NEITHER MICHIGAN LAW NOR PRINCIPLES OF EQUITY SUPPORT THE MAJORITY'S RULE

In light of the legal doctrines discussed above, defendant here is not unjustly enriched when he takes full ownership by a right of survivorship to property held as a tenant by the entirety. And this is true even if one cotenant has contributed more to the expenses of property ownership within the marriage, which is consistent with how the cotenants designed their marriage. There simply is no obligation in Michigan for a cotenant by the entirety to pay interest and expenses to the estate of the deceased cotenant when fee simple title passes by operation of law. The surviving cotenant, receiving title by right of survivorship as the parties agreed when titling the property, cannot be *unjustly* enriched. Instead, the cotenant by the entireties takes fee ownership to property in which he already had prior *sole, inalienable* ownership with his spouse. As this Court stated in *Buell*, there can be no unjust enrichment where a person comes into ownership of property that "'*law and equity give him absolutely* without any obligation on his part to

12

make restitution.'"[27]   Here, by operation of law, Frank Mandeville automatically takes the properties in fee simple absolute by the right of survivorship inherent in the tenancy by the entirety, which was exactly the Mandevilles' intent when they purchased the properties more than 20 years ago.[28]   Neither plaintiff nor the majority can persuasively argue that, in taking full ownership to property he already owns, Frank Mandeville will retain "money or benefits" that belong to another.

The majority holds otherwise.   Through an elaborate formulation, the majority attempts to rebalance the equities of the Mandevilles' marriage in order to show that Frank Mandeville was unjustly enriched because his wife paid certain costs associated with home ownership for an 18-month period.   In the process, the majority has created a rule that subverts the purpose of the tenancy by the entirety and unnecessarily allows the state to dissect the marital relationship for the purpose of reassigning equities contrary to how the parties saw fit to title their property and conduct their marital relationship.   More disturbing, the majority does so notwithstanding the fact that neither Janet nor Frank

---

[27] *Buell*, 327 Mich at 56 (citation omitted; emphasis added).   The majority criticizes my discussion here as "an oversimplification that is at odds with the realities of this case," yet the majority can point to no place in the record nor any legal authority that establishes an agreement, understanding, or obligation for Frank Mandeville to make restitution in order to hold fee simple title to the property.   This is unsurprising because the right of survivorship, *by its very nature*, unconditionally allows Frank Mandeville to do so without any obligations at law.

[28] Moreover, as defendant notes, he takes the property subject to a substantial mortgage that remains on the property.   As a result, the deceased was provided the benefit of the use of the mortgage principal in her lifetime, yet upon her death the debt now resides with defendant alone.

13

Mandeville took any legal action *while both spouses remained alive* that would have extinguished the tenancy by the entirety that governed the properties at issue here or rebalanced the equities of their marriage. Indeed, despite Frank Mandeville's extended absence, the couple did not consider their marriage over,[29] they never sought a divorce or legal separation, nor did Janet Mandeville file an action for separate maintenance.[30]

---

[29] See Affidavit of Beverly Furnari, August 13, 2003. After being duly sworn, Ms. Furnari stated as follows:

> 1. That she was a close personal friend of Janet Mandeville and had frequent contact with her during the last few months of her life.

> 2. That through discussions with Janet Mandeville, she is aware that neither Janet Mandeville nor Frank Mandeville, Jr. considered their marriage to be terminated, deserted or abandoned by Frank Mandeville, Jr.'s extended absence exceeding more than one year prior to the death of Janet Mandeville.

This evidence is *uncontroverted*, yet the majority has decided simply to overlook this fact as inconvenient to its analysis.

[30] This is so even though the decedent attempted to divest her spouse of his interest in properties they owned by the entirety before she died—a fact to which the majority attaches a great deal of significance. See *ante* at ___. As was explained to Janet Mandeville by her counsel at the time she attempted to transfer her interest in the property by quitclaim deed, the documents drafted to accomplish this intention were *entirely ineffectual* to destroy defendant's rights in the property that Janet Mandeville owned by the entirety with her husband. See *supra* at 6 (explaining that one spouse in a tenancy by the entirety can neither divest the other spouse of his interest or act unilaterally to alienate the entireties property). Janet Mandeville's attorney testified at his deposition that "I explained to Jan that if, in fact, the real estate was owned by the entireties with her and Frank, that these quit claim deeds would have no validity whatsoever. That if Frank was alive, they would go to him. . . . She understood, she nodded. She said, 'I understand.'" Plaintiff's attorney again conceded as much at arguments on this case: "She effectuated a deed which has obviously no legal significance because its impossible to—for her to transact that."

14

The majority's opinion ignores the fact that marriage has always been recognized in Michigan as a *special* relationship unlike those involved in other concurrent ownership relationships. Thus, it is worthy of unique protections that can only be altered upon formal dissolution in a divorce or modification in a separate maintenance action. The majority's decision transforms this special marital relationship into no more than a mere "business partnership." Married couples have the additional options of buying property as tenants in common or joint tenants. *A married couple that enters into a tenancy by the entirety does so in specific reliance on the unique protections that our common law affords this form of joint property ownership.* Today's decision eviscerates such reliance interests but fails to explain why these interests are no longer worthy of protection. The majority's decision is yet another (however well intentioned) assault on the institution of marriage in our country.

The majority states that nothing in its analysis would alter the reality that Frank Mandeville is the fee simple owner of the properties previously held with his wife, and that the law of the tenancy by the entirety "has already been given full effect . . . ."[31] This is true only to a certain extent.[32] The majority does not alter the actual ownership of the property, but it does force defendant to compensate the estate for the privilege of such

---

[31] *Ante* at ___.

[32] The fact is, the estate *did* attempt to divest Frank Mandeville of his property interest in this property and only raised this contribution claim when that effort failed. The majority decision today allows this backdoor collateral attack on defendant's property rights as the surviving tenant.

ownership—notwithstanding the fact that *both* the law *and* the express means by which the Mandevilles themselves titled their property provide this property to Frank Mandeville with *no conditions whatsoever*. Thus, the majority cannot deny that it is today recognizing a new right of contribution that *diminishes* the property rights of a surviving tenant by the entirety.

Moreover, contrary to the majority's argument, this is *not* an appropriate case in which to employ this Court's equitable powers. Equity is customarily employed only where there is *no adequate remedy at law*.[33] Here, Janet Mandeville had several available remedies that she declined to pursue. These remedies include filing for divorce or separate maintenance.[34] An action for separate maintenance, for example, would not require the couple to seek a divorce; instead, a showing that the marriage relationship had broken down—*precisely what plaintiff argues happened in this case*—would allow the trial court to make a determination based on all the circumstances as to how much financial support would be due to a complainant.[35] It could do so on the basis of the

---

[33] *Campau v Godfrey*, 18 Mich 27 (1869).

[34] See MCL 552.6 (divorce) and MCL 552.7 (separate maintenance).

[35] See, e.g., *Russell v Russell*, 75 Mich 572, 572-573; 42 NW 983 (1889) (affirming an award of financial support from a husband to his wife where the husband had deserted the marriage). Since the adoption of no-fault divorce in Michigan, fault need not be shown in an action for separate maintenance; instead, an action showing that there has been a breakdown in the marriage relationship to the extent that the objects of matrimony have been destroyed and thus the marriage cannot be preserved is sufficient to support an award. See MCL 552.7(1).

16

evidence offered by *both* spouses—something that cannot be done after one of the spouses has died.

The fact is that a claim for separate maintenance seems to be *precisely* the remedy contemplated by our Legislature to provide relief to an aggrieved spouse in this type of situation. Yet, the majority cannot adequately explain why the already existing action for separate maintenance is an inadequate legal remedy. Instead, the majority prefers to create an action for contribution that allows an estate to collaterally attack financial arrangements made during the course of a valid marriage. The majority states that an action for divorce or separate maintenance is "inappropriate" and "disproportionate," and thus apparently "inadequate." This is ironic given that the *standard* that the majority employs—a breakdown in the marital relationship sufficient to show that the couple is no longer acting as husband and wife—is *precisely* the standard used in an action for divorce or separate maintenance proceedings. *I fail to see how the majority can reject this standard as inadequate as a matter of law while at the same time using it as an equitable substitute for these supposedly inadequate legal remedies.* Although the majority argues that these remedies are not "as 'effectual'" as a claim for contribution, that hardly demonstrates that they are inadequate as a matter of law.[36] Although the majority focuses

---

[36] I further fail to see how the majority's new remedy, which requires one spouse to sue another in court when demanding contribution, is any more "effectual" than an action for separate maintenance, even if it "preserves" the marital union—or whatever may be left of a union between spouses who communicate with each other through lawsuits.

on claims for divorce as "a hugely blunderbuss 'remedy,'"[37] it simply has *no answer* for why an action for *separate maintenance* is inadequate. This flaw in the majority's argument not only belies its conclusion that equity should be employed in this case,[38] but also undermines the entire rationale of the majority opinion.

While it would certainly be troubling for courts to attempt to recalibrate the equities of a marriage after death, the majority's decision is even more troubling because it does just that when the parties declined to take available legal action in life. A longstanding principle of this Court precludes equitable relief to parties who do not fully pursue the remedies available to them at law.[39] Just as Michigan courts are incompetent

---

The majority also worries that an action for separate maintenance opens the door for a court to enter a decree of divorce, and that this may be an unacceptable outcome for those couples who have moral or religious objections to divorce. This concern ignores what is obvious about such a concern: if a couple has religious objections to divorce, then by the nature of those objections, the responding spouse would not counterclaim for a divorce in an action for separate maintenance. In any case, where a couple has decided no longer to live together as husband and wife but not divorce, an action for contribution is no more effectual than an action for separate maintenance. The primary difference is that only the latter was provided for by our Legislature, and only the latter prevents a spouse from unilaterally requiring a court to rebalance the equities of marital decisions.

[37] *Ante* at ___.

[38] The majority quotes *Powers v Fisher*, 279 Mich 442, 447; 272 NW 737 (1937), for the proposition that the "legal remedy, both in respect to its final relief and its modes of obtaining the relief, must be as effectual as the remedy which equity would confer under the circumstances . . . ." How can separate maintenance possibly be viewed as inadequate when, if it had been pursued, it would have allowed Janet Mandeville to acquire the same costs her estate now seeks here, after making virtually an identical legal showing that the marital relationship had broken down?

[39] See *Zoellner v Zoellner*, 46 Mich 511, 515; 9 NW 831 (1881).

18

to grant a divorce after the death of one of the parties,[40] unlike the majority, I believe that courts are equally incompetent to reassign equities, divide property, or award monetary contribution concerning marital property owned by the spouses after the death of one *as if* a divorce had occurred.

The majority also argues that the Legislature's enactment of the surviving spouse provision of the Estates and Protected Individuals Code[41] indicates its intent to recognize that a marital relationship can cease to exist even if it is not officially or legally severed. This argument is simply a nonstarter. The surviving spouse provision states that, if certain conditions are met showing a breakdown in a marriage, then a surviving spouse will not be treated as having survived the decedent.[42] However, the provision also *specifically restricts* its applicability to issues of intestate succession, spousal elections and allowances, and priority among persons seeking appointment as personal

---

I do not, as the majority implies, believe that Janet Mandeville was "derelict" in pursuing her legal remedies. In many respects, she dutifully and permissibly transferred her legal interests to beneficiaries other than her husband. This is irrelevant, though, to whether she pursued an action for separate maintenance—she admittedly did not—which was the only permissible means for seeking payment from defendant concerning their marital property owned by the entirety. More important, this does not mean that her estate should be accorded the extraordinary relief sought here because she could not otherwise legally transfer her interest in real property.

[40] Michigan law provides that a court is without jurisdiction to render a judgment of divorce, and thereafter distribute property, after the death of a party; in sum, one cannot judicially terminate a relationship that no longer exists because the death of a party. *Tiedman v Tiedman*, 400 Mich 571, 573; 255 NW2d 632 (1977); *Zoellner*, 46 Mich at 513-514.

[41] MCL 700.1101 *et seq.*

[42] MCL 700.2801(2)(e)(*i*).

19

representatives.[43]  Thus, the Legislature expressly limited the surviving spouse provision

to specific circumstances involving a deceased spouse, none of which is present here.

Pursuant to well established principles of statutory construction,[44] this Court *should*

*decline* plaintiff's request to extend the application of this statute where the Legislature

has expressly limited it.[45]

---

[43] See MCL 700.2801(2), which provides that its application is only "[f]or purposes of parts 1 to 4 of this article," which cover only issues of intestate succession, spousal elections and allowances, and priority among persons seeking appointment as personal representatives.

[44] See, e.g., *Dep't of Agriculture v Appletree Mktg, LLC*, 485 Mich 1, 8; 779 NW2d 237 (2010) ("In interpreting statutory language, this Court's primary goal is to give effect to the Legislature's intent.  If the Legislature has clearly expressed its intent in the language of a statute, that statute must be enforced as written, free of any 'contrary judicial gloss.'") (citation omitted); *Miller v Mercy Mem Hosp*, 466 Mich 196, 201; 644 NW2d 730 (2002) (stating that when interpreting a statute, "[w]e first review the language of the statute itself.  If it is clear, no further analysis is necessary or allowed to expand what the Legislature clearly intended to cover.").

[45] This is the most basic of judicial interpretative rules, as members of the majority have properly recognized in the past.  See, e.g., *Robertson v DaimlerChrysler Corp*, 465 Mich 732, 759 & n 14; 641 NW2d 567 (2002) (opinion by MARKMAN, J.) (noting that "our judicial role 'precludes imposing different policy choices than those selected by the Legislature . . . .'"  and stating: "The dissent 'question[s] whether, under the majority's approach, compensability for any mental disabilities would ever exist.'  To say the least, we respectfully disagree . . . .  Compensability would exist where the Legislature has deemed there to be compensability, and it would not exist where the Legislature has not deemed there to be compensability.  Whether such coverage is too broad or too narrow is not for us to decide."); *Henry v Dow Chem Co*, 473 Mich 63, 102; 701 NW2d 684 (2005) (opinion by CORRIGAN, J.) ("Equity is indeed an instrument of justice.  But when it is exercised without due regard for the interests of those who are not before the Court, its invocation can lead to great injustice.  It is precisely because a decision in plaintiffs' favor may have sweeping effects for Michigan's citizens . . . that we believe this matter should be handled by those best able to balance these competing interests: the people's representatives in the Legislature."); *Stokes v Millen Roofing Co*, 466 Mich 660, 675, 677-678; 649 NW2d 371 (2002) (MARKMAN, J., concurring) (noting the unfairness of the

Today, however, the majority manufactures an extension of the surviving spouse provision despite the limitations plainly expressed by the Legislature. The majority borrows the criteria of the surviving spouse provision as a means of deeming the Mandevilles' relationship sufficiently defunct to merit the employment of equity through a right of contribution while it ignores the limitations that the Legislature specifically imposed. It stands to reason that any time a spouse qualifies under MCL 700.2801 as a nonsurviving spouse, the majority would allow the estate of the decedent spouse to seek contribution for any perceived inequities. Thus, notwithstanding the majority's protestations to the contrary, its theory now results in the wholesale application of the surviving spouse provision in a new class of cases not otherwise contemplated under the plain language of the statute. I do not believe it is within a judge's power to borrow a limiting principle "inherent" in a statute that specifically excludes the very issue to which it would be applied and apply it in situations divorced from the statutory scheme and intent. The general equitable powers of this Court do not increase the judicial power to rewrite statutes.[46]

---

result, which is "highly inequitable," but otherwise stating that this Court "cannot allow equity to contravene the clear statutory intent of the Legislature. . . . [I]f such inequitable results are to be avoided, it is the Legislature that must take action.").

[46] See, e.g., *Trentadue v Buckler Automatic Lawn Sprinkler Co*, 479 Mich 378, 406-407; 738 NW2d 664 (2007) ("[I]f courts are free to cast aside a plain statute in the name of equity, even in such a tragic case as this, then immeasurable damage will be caused to the separation of powers mandated by our Constitution. Statutes lose their meaning if 'an aggrieved party need only convince a willing judge to rewrite the statute under the name of equity.' Significantly, such unrestrained use of equity also undermines consistency and predictability for plaintiffs and defendants alike.") (citations omitted).

## B. THE MAJORITY'S NEW RULE IS UNPRECEDENTED

The majority has not cited a single authority from this state or any other that provides support for its position allowing an action between spouses for contribution regarding property held as a tenancy by the entirety *outside the context of divorce or separation proceedings*. Indeed, no such authority exists. The decisions from other jurisdictions cited by the majority support its position only when read out of context and after ignoring those decisions' own internal limitations. There should be no mistake: the rule that the majority today creates represents a radical departure from this state's jurisprudence.

In *Crawford v Crawford*, a wife sought contribution for property-related expenses incurred after the couple had separated but not yet divorced. At issue was the presumption that any money paid by one spouse should be considered a gift to the other spouse, and thus not eligible for contribution in the divorce. Under Maryland law, where the parties had separated before divorce, "a co-tenant in a tenancy by the entireties is entitled, to the same extent as a co-tenant in a tenancy in common or joint tenancy is entitled, to contribution for that spouse's payment of the carrying charges which preserve the property."[47] The Maryland Court of Appeals held that absent a showing that the paying party intended to make a gift, "a tenant by the entireties is entitled to contribution when he or she makes a payment, after the parties discontinue living together as husband and wife, which preserves the property and, therefore, accrues to the benefit of the co-

---

[47] *Crawford v Crawford*, 293 Md 307, 311; 443 A2d 599 (1982).

tenant."[48]  In Maryland, where a court finds contribution appropriate for one cotenant in equitable separation proceedings, that cotenant may receive "*Crawford* credits."  As a later decision from the Maryland Court of Special Appeals explained:

> A "Crawford Credit" is a credit that one co-tenant, who, *after separation*, lays out money to make mortgage payments or other carrying charges on property held as tenants by the entireties, is usually entitled to receive, absent an agreement between the parties.  Prior to a divorce decree, the entitlement of a spouse to such credits is an equitable matter and not a matter of right.[49]

The Maryland Court of Special Appeals later applied this concept in *Turner v Turner*, a *divorce action* that stated that the general law of contribution applies to a tenancy by the entirety "'when married parties, owning property jointly, separate.'"[50]  *Crawford*, as applied now when courts issue "*Crawford* credits," appears to have become a legal colloquialism for assigning and balancing equities when dividing property in divorce proceedings.  These decisions are entirely consistent with Maryland's *divorce* law and provide no support for plaintiff's theory that contribution is appropriate where no divorce proceeding exists, and certainly not where a spouse has died.

---

[48] *Id.* at 313.  This same principle was applied in the same manner in *Turner v Turner*, 147 Md App 350, 406-407; 809 A2d 18 (2002), another Maryland case cited in this Court's original remand order.

[49] *Freedenburg v Freedenburg*, 123 Md App 729, 737 n 1; 720 A2d 948 (1998), citing *Crawford*, and *Broseus v Broseus*, 82 Md App 183, 192; 570 A2d 874 (1990) (emphasis added).

[50] *Turner*, 147 Md App at 406, quoting *Baran v Jaskulski*, 114 Md App 322, 332; 689 A2d 1283 (1997).

Similarly, in *Cagan v Cagan*, a New York trial court allowed the plaintiff to recover costs for payments made by one tenant by the entirety in order to maintain the property and prevent foreclosure *following an action for separation*.[51] In a later case also from New York, the Supreme Court, Appellate Division, held that the responsibility for mortgage payments, taxes, and insurance on an entireties property should not be borne solely by the cotenant who remained in possession *after a legal decree of separation was entered* on the grounds of abandonment.[52]

The common thread among these cases is that the plaintiffs were able to overcome—in *live divorce proceedings that sought to partition marital property*—the presumption that money expended by one party to the divorce to maintain a concurrent estate was not a gift to his or her spouse.[53] In a divorce action, it is *necessary* to make equitable divisions of property among the living spouses, and this necessarily includes what is often a couple's largest asset: their home. It is an unremarkable proposition that divorce courts, *sitting in equity while dividing marital property*, would require contributions to the spouse who paid more than his share during the divorce process, even when dealing with a couple who own their home as tenants by the entirety.

---

[51] *Cagan v Cagan*, 56 Misc 2d 1045, 1049-1050; 291 NYS2d 211 (1968).

[52] *Sterlace v Sterlace*, 52 AD2d 743, 743-744; 382 NYS2d 191 (NY App 1976).

[53] States whose laws have this legal presumption apply it in relation to every type of concurrent estate. In addition to the above cases discussing the presumption in relation to a tenancy by the entirety, see also *Kratzer v Kratzer*, 130 Ill App 2d 762, 768-769; 266 NE2d 419 (1971) (tenancy in common); *Heinemann v Heinemann,* 314 So 2d 220, 221-222 (Fla App, 1975) (joint tenancy).

And Michigan divorce law is in accord with these principles of law articulated in other states. Michigan law demands equity in divorce and other domestic relations proceedings. Statutory law provides that upon an annulment of a marriage, a divorce, or an order of separate maintenance, a court will divide property "as it shall deem just and reasonable . . . ."[54] A separate statutory provision allows a court to award to either party a portion of the other's real and personal property, as well as spousal support, "as the court considers just and reasonable, after considering the ability of either party to pay and the character and situation of the parties, and all the other circumstances of the case."[55] In sum, when apportioning marital property *in a divorce*, Michigan courts must make a division that, although it need not be equal, must be equitable considering all the circumstances.[56]

However, the cases on which the majority relies—discussing the presumption of gift doctrine among spouses and equity in divorce and separation actions—interpret concepts that are separate and distinct from those relevant to a tenancy by the entirety that is automatically terminated upon death. As such, they are wholly inapposite to the case presently before this Court, and their "logic and reasoning" most certainly do *not*

[54] MCL 552.19.

[55] MCL 552.23(1).

[56] E.g., *McDougal v McDougal*, 451 Mich 80, 88; 545 NW2d 357 (1996); *Sparks v Sparks*, 440 Mich 141, 149; 485 NW2d 893 (1992) (noting that Michigan's divorce "statutes each include an indication that general principles of equity must be considered"); *Reeves v Reeves*, 226 Mich App 490, 493; 575 NW2d 1 (1997) (stating that courts "must strive for an equitable division of increases in marital assets").

25

"closely resemble" this case, as the majority alleges.[57] They present facts and thus legal decisions involving a *living husband and wife in the context of divorce or separation actions that are being actually litigated for the very purpose of partitioning marital property*. Indeed, the majority recognizes and admits this, stating that "the issues in these out-of-state cases undisputedly arise in the context of divorce and separate maintenance actions . . . ."[58] Yet, the majority's argument irresponsibly and imprecisely conflates the law of contribution as applied in these two separate and distinct contexts. The majority argues that, because domestic relations and divorce law generally allows claims of contribution when necessary to produce an equitable result, this should also control when determining parties' rights and obligations in managing real property in probate after the death of a spouse. I strongly disagree.

---

[57] See *ante* at ___. Certainly those cases share some similar factual situations with this case—as any divorce or separation case likely will. This does not mean that the *legal principles* in those divorce and separation cases should be applied here, where one spouse is deceased. The majority extracts fragments of sentences from those opinions, showing how those phrases could be said to be true on the facts of this case by inserting the names of the parties in this case. In doing so, the majority does precisely what I believe is improper: it takes cases where courts *in the context of divorce or separation proceedings* are reassigning equities and uses them to reassign equities in this case.

[58] *Ante* at ___. The majority also argues that "*No state* whose courts have addressed this specific proposition has rejected it." *Ante* at ___ n 16. This argument is disingenuous because *no other state has considered the subject matter of this case*. Indeed, in order to gain contribution among tenants by the entirety, every other state seems to require what this dissent requires: a live case and controversy among living spouses in a divorce, separation, or separate maintenance proceeding. The majority extracts a generalized rule from these other cases—which allow contribution in these limited situations—in support of its unprecedented rule in this case allowing contribution generally and even after the death of a spouse.

It is difficult to apply the principles of these foreign cases after the death of one of the parties where there has been no divorce (or even any steps taken toward obtaining a divorce or separate maintenance), and no attempt to dispose of the property with judicial oversight while the parties remained alive. Contribution related to property held as a tenancy by the entirety is only available under Michigan law in the context of a divorce, separation, or separate maintenance proceeding where a court, addressing a breakdown in the marriage, is forced to balance the equities between the parties. Thus, because Janet Mandeville *could not* have sought contribution from defendant while alive because she did not pursue an action for divorce, separation, or separate maintenance, her estate likewise cannot pursue such an action.[59] The law is pellucidly clear that absent the destruction of the tenancy by the entirety by one of the legal means previously described,[60] the death of a cotenant by the entirety automatically makes the surviving spouse the sole owner of the property and simultaneously extinguishes the decedent's ownership interest in the property. Thus, by operation of the type of estate chosen by the Mandevilles and how the Mandevilles chose to structure and maintain their marriage, there is no entitlement to order contribution in this case.

---

[59] This makes the majority's reliance on MCL 600.2921 inappropriate where that provision states that "[a]ll actions and claims survive death" and thereby allows estates to bring claims on behalf of their decedents. See *ante* at ___ n 14. Because there is no cause of action under Michigan law for a tenant by the entirety to seek contribution, MCL 600.2921 cannot save any claim for a decedent's estate to pursue. To the extent that the Court of Appeals held contrarily, I believe that it erred; to the extent that the majority establishes a new right of contribution that may be "saved" by MCL 600.2921, it too errs.

[60] See *supra* at 7-8 (discussing how a tenancy by the entirety can be terminated).

## C. ALTHOUGH THE COMMON LAW RULE IS EQUITABLE, THE MAJORITY REJECTS IT IN FAVOR OF A NEW RULE THAT IS CONTRARY TO THE POLICIES OF THIS STATE

While this Court unquestionably has the authority to modify the common law,[61] doing so is a task we approach with the utmost caution,[62] and this case is a good illustration as to why. We are presented here with a set of rules that has been in place and applied in common law societies since before Michigan became a state. Everyone from young couples buying their first home to estate planners advising their clients how to structure their property have relied on these tenets with the justified expectation that the force of law will protect their choices. The majority's decision to change the common law in this case represents a sea-change in our laws governing property and threatens to upend legitimate financial relationships into which married persons have entered.[63]

---

[61] See, e.g., *Ames v Port Huron Log Driving & Booming Co*, 11 Mich 139, 145-155 (1863) (opinion by CAMPBELL, J., and opinion by MANNING, J.).

[62] See, e.g., *Henry*, 473 Mich at 89.

[63] The majority chalks this discussion up to "unwarranted policy concerns," *ante* at ___, but because plaintiff requests that we *change the common law of this state*, it is imperative that this Court base its decisions firmly on the now-established laws and policies of this state. Indeed, the majority's author has persuasively explained as much:

> In identifying the boundaries of public policy, we believe that the focus of the judiciary must ultimately be upon the policies that, in fact, have been adopted by the public through our various legal processes, and are reflected in our state and federal constitutions, our statutes, and the common law. See *Twin City Pipe Line Co v Harding Glass Co*, 283 US 353, 357; 51 S Ct 476; 75 L Ed 1112 (1931). The public policy of Michigan is *not* merely the equivalent of the personal preferences of a majority of this Court; rather, such a policy must ultimately be clearly rooted in the law. There is no other proper means of ascertaining what

28

There is a great danger in authorizing courts to engage in post hoc factual inquiries concerning how a husband and wife should have decided to structure their marriage, their finances, and the various equities involved in a lifetime of making choices as a couple rather than as individuals pursuing separate self-interests. The majority fails to address the unknown—and perhaps unknowable—implications that accompany its change in the common law. Beyond recounting the facts of this case, the majority does not discuss what facts would be legally sufficient for courts to divide marital property equitably after death. Nor does the majority sufficiently address what would serve as the limiting principle concerning a contribution claim against the surviving spouse. Moreover, as previously stated, the majority's new rule upsets the reliance interests of all Michigan spouses who have entered into tenancies by the entirety in preference to other forms of lesser protected joint property relationships. Strangely, but perhaps not unexpectedly, the majority opinion is silent on its justifications for unsettling these reliance interests.

Instead, the majority rests on the standards set forth by the surviving spouse provision, inappropriately borrowing its framework to order contribution in this case, even though the Legislature never intended this provision to be used in such a way. Yet, where this Court is considering a sweeping change to Michigan's common law through

---

constitutes our public policy. [*Terrien v Zwit*, 467 Mich 56, 66-67; 648 NW2d 602 (2002) (opinion by MARKMAN, J.) (emphasis in original).]

My discussion below sets forth the arguments justifying my belief that the majority's change to the common law is not based on the well established legal principles and policies of this state. That the majority's decision is contrary to these policies speaks more to the lack of firm support for its opinion rather than any "flaws" in my discussion.

the employment of equity, I believe that the justices certainly owe more consideration and guidance to future courts than what amounts to the majority's theory of "I know it when I see it." The majority uses the rare facts of this case to change the overarching principle applicable in all cases; in essence, it uses the exception to rewrite the rule.

In its desire to order contribution for a plaintiff it clearly deems sympathetic, the majority leaves myriad questions unanswered regarding the scope of this newfound legal avenue to collaterally attack financial arrangements made in the course of a valid marriage. Particularly in situations where neither spouse ever asked a court to intervene in the marital relationship, it is deeply troubling that the majority now allows courts to do so under the guise of equity after the death of a spouse. This difficulty in allowing estates to pursue an action for contribution or unjust enrichment after the death of a spouse, particularly where neither party ever sought separate maintenance, is that doing so risks upsetting intimate and perfectly legitimate marital arrangements and the law that heretofore supported such relationships.

This difficulty arises because courts are poorly positioned to make such weighty decisions after the death of a married party, and especially as here, where the parties *themselves* chose not to end their marriage. For example, at least in cases that follow the historical norm in which men contribute more than their spouses to acquiring and maintaining family property, the rule adopted by the majority may be turned into a "sword" to be used against stay-at-home wives and women who earn less than their husbands. Similarly, I wonder whether the majority would permit a rebalancing of marital equities *any time* a husband and wife have discontinued living together, or where

30

there is no showing of an intent to make a gift, or where one spouse in a rocky marriage takes action that benefits the other spouse—all facts that the majority finds relevant to rebalance the equities of the Mandevilles' marriage. Under the majority's theory, what would stop disgruntled spouses, third parties, or courts from intervening in the financial arrangements of marriages wherever "principles of natural justice" and "good conscience so dictate"?[64] And to what extent does the majority allow courts to assess the equities of a marriage—which may last for decades—in determining the appropriate level for contribution? Should defendant receive credits or be allowed to counterclaim against a plaintiff-estate for areas in the marriage where he shared a larger portion of the financial burden, as he likely would have in a divorce or separate maintenance proceeding? The majority simply does not—and probably cannot—answer these questions. Because the method by which spouses arrange their financial circumstances is entirely a product of their own determination and in accordance with their wishes and values, I would decline to authorize this type of post hoc judicial inquiry into the equitable nature of those arrangements that the majority permits—indeed, requires—upon a challenge of this nature.

Moreover, by accepting plaintiff's invitation to change our common law, the majority today creates an unprecedented action akin to allowing a new type of "posthumous divorce" in this state. As the preceding sections discussing Michigan

---

[64] Where, other than in the guts of the majority, shall we determine how "principles of natural justice" or "good conscience" should direct our decisions?

divorce law and caselaw from our sister states demonstrates, the only method by which a spouse can normally obtain contribution for property involving a tenancy by the entirety is when a court is balancing equities concerning property in divorce or separate maintenance proceedings. That being the case, the majority grants plaintiff the *same relief* that Janet Mandeville would have been accorded in a divorce or separation, but without the benefit of an *actual* divorce or separation proceeding. And indeed, the majority treats the Mandevilles' marriage as sufficiently defunct in order to hold defendant liable for contribution.

I strongly object to any decision that recognizes an action amounting to posthumous divorce.[65] Following this decision, Michigan courts are now permitted to determine after a spouse's death whether a couple's relationship had broken down in life in order to reassign equities just as a family court would do in divorce or separate maintenance proceedings. The facts of this case show that neither Frank nor Janet Mandeville legally ended their marriage or took the steps that would allow courts to order contribution while Janet Mandeville was alive. Therefore, *courts should not be allowed to rebalance the equities of a marriage after the death of a party as if there had been a divorce* in order to determine the proper amount for monetary contribution. Recognizing

---

[65] Contrary to the majority's attempt to disparage this argument as mere frivolity by stating, for example, that this Court is not taking anyone's wedding rings, I simply state that the relief the majority orders in this case *amounts to* or is *tantamount to* a posthumous divorce. Where the majority makes such extraordinary *factual* findings as that the Mandevilles had "discontinued living together as husband and wife," it is hard to argue that the majority is doing anything other than mentally divorcing the couple in order to hold defendant liable for contribution.

the equivalent of posthumous divorce in this state is an untenable course of action for this Court to take where the positive law of this state has provided extensive indications that marriage is to be fostered, preserved, and ended only by judicial intervention at the request of the spouses themselves.[66]

I also recognize that the Legislature is better positioned to balance the complex public policy considerations inherent in plaintiff's request to allow the recalculation of equities after death or create a type of posthumous divorce in this state. As this Court has stated previously: "The responsibility for drawing lines in a society as complex as ours— of identifying priorities, weighing the relevant considerations and choosing between

---

[66] By allowing post hoc, posthumous judicial inquiries into the equities of a marriage, the majority's opinion here is in deep conflict with Michigan's public policy *favoring* marriage. See *Van v Zahorik*, 460 Mich 320, 332; 597 NW2d 15 (1999); *Wagoner v Wagoner*, 128 Mich 635, 638; 87 NW 898 (1901).

The majority's assertion that *its* opinion is the one that fosters and preserves marriage by allowing married couples to pursue actions for contribution is too clever by half. At its core, our society's respect for marriage relies on the marital couple itself to chart its own course and make its own decisions. In return, the marital couple relies on a set of established principles—legal and otherwise—to ensure that decisions will be given effect. Unlike the majority, I am not prepared to alter either this reliance or the principles themselves where one party unilaterally decides that he or she no longer likes the marital agreement. Ultimately, the majority's opinion allows plaintiff to obtain relief she otherwise would not be able to achieve based on the way the decedent and her husband structured their marriage. How can this possibly be said to preserve marriage or accord respect to the way a couple structured its marriage? Marriage necessitates mutuality in decision-making, yet the majority now grants to one spouse the power to invite courts into the marriage to analyze the decisions and equities as a court would in any normal business or partnership dispute—and worse still, it apparently allows a spouse to do so from beyond the grave. This absurd situation underscores the majority's inability to recognize this case for what it is: a marriage that arguably faltered in its latter years because of apparent problems for which there are settled, appropriate, and adequate remedies in existence that neither spouse in this case pursued.

33

competing alternatives—is the Legislature's, not the judiciary's."[67] This principle is even more important where the requested change in the common law is contrary to a public policy of the state, as is the case here.[68]

Further, I note that the Michigan Legislature has *declined* to adopt legislation that would have accomplished statutorily exactly the changes plaintiff seeks in the common law here.[69] And as observed earlier, the Legislature actually *has acted* in this area through its enactment of Michigan's surviving spouse statute. However, the Legislature acted in a highly *limited* fashion and has *not* extended the statute's reach in ways that would encompass the facts of this case.[70] In this regard, the Legislature has already selected a policy for this state. Nevertheless, the majority apparently has no qualms extending the common law in a contrary fashion. As previously noted, long-established principles of statutory construction do not give this Court the authority to do so. Normally, if the Legislature believes that such a historical principle should be changed, it

---

[67] *O'Donnell v State Farm Mut Auto Ins Co*, 404 Mich 524, 542; 273 NW2d 829 (1979); see also *Henry*, 473 Mich at 98 ("[W]hat we as *individuals* prefer is not necessarily what we as *justices* ought to impose upon the people. Our decision in this case is driven not by a preference for one policy or another, but by our recognition that we must not impose our will upon the people in matters, such as this one, that require a delicate balancing of competing societal interests. In our representative democracy, it is the legislative branch that ought to chart the state's course through such murky waters.").

[68] See *Van*, 460 Mich at 333 ("We hold that because the requested extension of the equitable parent doctrine would affect the state's public policy in favor of marriage, the Legislature is clearly the appropriate entity to consider this issue.").

[69] See SB 0062 (2007). The bill, introduced by Senator Judson Gilbert, passed *neither* chamber of the Michigan Legislature.

[70] See *supra* at 29-31.

34

is free to do so. Although to date the Legislature has declined to make such a change, the majority has instead fashioned an unprecedented judge-created rule in contravention of this state's public policy.

## III. CONCLUSION

There is an old legal adage that "bad facts make bad law." This phrase has rarely been as true as on the circumstances giving rise to this case. In its eagerness to provide relief to a plaintiff it deems sympathetic, the majority today rejects the legal remedies that were available to that plaintiff, and instead crafts an unprecedented new remedy. In doing so, the majority extends the law's equitable reach in new and unique ways, unsettling centuries of law in this area and implicitly reworking what is the key feature of a tenancy by the entirety: the unencumbered right of survivorship. Moreover, by allowing courts to make post hoc determinations regarding the distribution of equities in a marriage, the majority's decision imposes upon the citizenry of Michigan rules that amount to posthumous divorce under the guise of equity. And it does so by inappropriately borrowing the framework from a narrow statute limited in application by its explicit terms, resulting in the wholesale application of that statute into an area of law in which it was never intended.

Because the law's equitable reach is surely not designed to allow the estates of parties to accomplish after death that which the parties themselves declined to pursue in life, I dissent from the majority's decision today. Instead, I believe that plaintiff cannot present a claim under Michigan law or in equity that would allow the decedent's estate to recover contribution from defendant. Michigan law does not recognize a right of

35

contribution among tenants by the entirety, and thus plaintiff's claim is not cognizable under our current law governing real property. Nor, perforce, is her claim justified in equity on a theory of unjust enrichment. Defendant was not unjustly enriched when, by operation of law, he took sole ownership of marital property previously held as a tenancy by the entirety with the decedent. Unlike the majority, I would decline to extend the common law of this state as plaintiff requests. Michigan's public policy can provide no justification for, and is in fact antithetical to, the concept of "common law divorce" or the notion that courts should recalculate the equities involved in a marriage after a spouse has passed.

Accordingly, I vigorously dissent.

Robert P. Young, Jr.